Jose LEDESMA–VALDES, et al., Petitioners,

v.

Charles SAVA, District Director, New York District, U.S. Immigration and Naturalization Service, Respondent.

No. 85 Civ. 0401 (EW).

United States District Court, S.D. New York.

March 13, 1985.

---

Harry A. DeMell, New York City, for petitioners; Peter Hirsch, New York City, of counsel.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City, for respondent Charles C. Sava; Michael D. Patrick, Noel Anne Ferris, Sp. Asst. U.S. Attys., New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

This is an application by a group of aliens who sought to enter the United States illegally for a writ of habeas corpus[1] to enjoin the District Director of the Immigration and Naturalization Service ("INS" or "Service") from excluding them from the United States and for their release on parole pending a hearing and determination of their applications for political asylum pursuant to § 242(b) of the Immigration and Nationality Act ("the Act").

Petitioners are 25 of a group of 78 Cuban natives who attempted to enter the United States from Spain at John F. Kennedy Airport on December 21, 1984. The travel documents they presented upon arrival were found to be counterfeit and fraudulent by the INS.[2] Accordingly, because none of the group was "clearly and beyond a doubt entitled to land," all were detained pending exclusion hearings.[3] Of the 78 initially detained, 26 single males without family ties to the remainder of the group were taken into immediate custody and transferred to Houston, Texas. The remaining 52 consisted of family groups including adult men and women, and their children. Because there were no available facilities in New York adequate to house these family groups, they were detained in the custody of the airline carriers which brought them here.[4] The carriers were instructed to present the aliens to the Immigration Court on December 26, 1984 at the Federal Office Building, New York City. However, sometime prior to that date, 13 of the 52 aliens had absconded under "unknown circumstances" from a hotel where the airline carriers had lodged them. Evidently, because of loose security safeguards, the absconded just walked out of the hotel. All 13 remain at large.

Later, on December 26, 1984, the airlines presented the 39 remaining individuals in their custody to the Immigration Court in New York City. The exclusion hearings were then adjourned to afford them time to obtain counsel and to file applications for political asylum. Two juveniles were paroled into their father's custody in Miami and their proceedings were transferred to Miami.[5] With this parole of the children,

---

1. See 8 U.S.C. § 1105a(a)(9) (1982).

2. Each alien presented a refugee travel document purporting to have been issued by the INS pursuant to 8 C.F.R. § 223(a) (1984).

3. 8 U.S.C. § 1225(b) (1982).

4. Id. § 1227(b); 8 C.F.R. § 235.3(b), (c) (1984).

5. 8 C.F.R. § 212.5(a)(2)(ii) (1984).

the number of aliens remaining in custody in New York was 37. Within several days thereafter, all detainees were represented by retained counsel or by authorized *pro bono publico* representatives.

With respect to all pending applications for political asylum, the Immigration Court sought advisory opinions from the Department of State, Bureau of Human Rights and Humanitarian Affairs, as to the merits of the asylum claims,[6] and pending their receipt, adjourned the exclusion hearings to various dates in late March, April, and early May, 1985. All parole requests were denied because petitioners had failed to meet the requirements as specified in the regulations.[7]

On January 11, 1985, the Service was informed by the airline carriers that a family of four, two adults and two children (represented by petitioners' counsel), also somehow had managed to escape from custody and in this instance, too, the airlines' security personnel were unable to account for the escape. At this point, the total number of absconding aliens was 17, approximately one-third of the original 52 who had been detained upon arrival in New York. Following the latest escape, the District Director's Office determined, in the interests of security, that any remaining adult, not the parent of a child in carrier custody, should be transferred to the New York Service Processing Center ("SPC"). Two individuals were in that category and were transferred to the SPC along with a third, who volunteered to accompany his brother. Thus, 29 still remained at the hotel under the undesirable airline security supervision.[8] On January 15, 1985, the Service was advised that accommodations adequate to take care of the remaining 29, which included adults and children, were available at El Paso, Texas. Arrangements were made to transfer the group to El Paso by plane scheduled to depart from LaGuardia Airport via Eastern Air Lines on the afternoon of January 16, 1985. Counsel for the respective departees were notified of the proposed transfer. According to the return to this application filed by the Assistant Director of Detention, the group boarded the aircraft no later than 2:30 p.m., the plane left the gate and began taxiing toward the runway between 2:40 p.m. and 2:50 p.m., and departed shortly thereafter, arriving in El Paso, Texas on the evening of January 16, 1985. Remaining behind were two of four adult aliens held in Service custody, including one of the named petitioners in this proceeding.

According to petitioners' counsel, the petition was filed in this Court at approximately 2:15 p.m. on January 16th but was not signed by Judge Goettel until sometime between 2:35 and 2:45 p.m. by which time the plane had already taken off and was somewhere over the state of New Jersey or Pennsylvania with the petitioners still in the control and custody of representatives of respondent.[9] However, the fact is that Judge Goettel struck a clause in the order to show cause which would have stayed the departure of the petitioners until the hearing and determination of this petition for a writ.

In any event, there are presently in custody at El Paso 31 aliens of the original group. The males, seventeen years and older, are detained at the Service Processing Center, which is owned and operated by the INS. The females and all juveniles are detained at "Alternative House," a nearby facility accommodating family groups, which is a privately owned facility under contract to the United States Marshal's office. "Alternative House" is a former motel that has been converted to a minimum security facility, and is accredited by the American Correctional Association. It has recreational facilities indoors and outdoors,

---

6. *See id.* § 208.10(b).

7. *See id.* § 212.5.

8. One other adult had been transferred earlier, upon a determination that he should have originally been separated because he was unrelated to any other aliens in the group.

9. Affidavit of Harry DeMell, Esq., ¶ 2, Feb. 17, 1985; Affidavit of Harry DeMell, Esq., ¶ 12, Feb. 11, 1985.

televisions in each room, and available laundry facilities. Mothers and children in the group have not been separated. Finally, the Director's return states that legal services, both private and *pro bono publico,* are and have been made available to all the detained members of the group.

An amended petition filed on behalf of petitioners by an attorney located in this district alleges that all the aliens are unlawfully detained; that they have been deprived of a right to counsel of their choice authorized by 8 U.S.C. § 1362; and that they have been denied procedural due process rights guaranteed by the Fifth Amendment to the United States Constitution.

## DISCUSSION

A threshold issue raised by the District Director is whether this Court has jurisdiction to hear and determine the claims of petitioners since all (except one who is located within the Southern District of New York and as to whom respondent concedes jurisdiction) are now, and have been since the evening of January 16, 1985, in the custody of immigration officials at El Paso, Texas. In sum, respondent contends that this court lacks jurisdiction over the custodian of the El Paso petitioners and that the issues raised by them must be adjudicated in the United States District Court for the Western District of Texas, the place of their detention. The thrust of the argument is that the petitioners were aboard the plane en route to El Paso at the time of the filing of their petition for relief and the issuance of the order to show cause soon thereafter; and that prior to their transfer, they were being detained within the Eastern District of New York, either earlier in the day at Kennedy Airport or just prior to their departure at LaGuardia Airport. Accordingly, the respondent urges that all issues raised by the El Paso petitioners must be adjudicated in El Paso, the place of

their present detention, and that their petitions should be dismissed or transferred to the Western District of Texas pursuant to 28 U.S.C. § 1404(a).

The issue, however, is not where respondent placed the petitioners while they were in his custody, but whether the Court had jurisdiction over respondent as petitioners' custodian at the time the petition was filed and the order to show cause served. "The writ of habeas corpus does not act upon the prisoner who seeks relief, but upon the person who holds him in what is alleged to be unlawful custody.... So long as the custodian can be reached by service of process, the court can issue a writ 'within its jurisdiction' requiring that the prisoner be brought before the court for a hearing on his claim, or requiring that he be released outright from custody, even if the prisoner himself is confined outside the court's territorial jurisdiction."[10] There can be no question here that the respondent, the District Director, had custody of the petitioners while he was within the Southern District of New York. He maintains his office here and conducts his official activities, including the detention of those who seek to enter into the United States from the airports adjacent to this District, from his office within this District. The fact that he decides to lodge detainees outside the district where he conducts his activities, or as in this case with airlines that may place them in hotels outside the district, does not deprive the District Director of control and custody over those aliens. So, too, when he decided to transfer petitioners to El Paso, Texas, they remained in his continued custody until his agents, who accompanied them throughout the airplane trip, surrendered custody to the immigration authorities at El Paso. Up to that point, the respondent was capable at all times of giving effect to the terms of any order issued under the application for

---

**10.** *Braden v. 30th Judicial Circuit Court,* 410 U.S. 484, 494–95, 93 S.Ct. 1123, 1129, 35 L.Ed.2d 443 (1973) (overruling *Ahrens v. Clark,* 335 U.S. 188, 68 S.Ct. 1443, 92 L.Ed. 1898 (1948) to the extent it required presence of the petitioner in the district); *see Strait v. Laird,* 406 U.S. 341, 343, 92 S.Ct. 1693, 1694, 32 L.Ed.2d 141 (1972); *Jones v. Cunningham,* 371 U.S. 236, 243–44, 83 S.Ct. 373, 377, 9 L.Ed.2d 285 (1963).

the writ. In sum, as required by 28 U.S.C. § 2243, the application for the writ was properly "directed to the person having custody of the person detained." [11] Accordingly, the Court holds that it does have jurisdiction to pass upon the merits of the application which it now considers.[12]

■ At the outset, it is noted that this action is brought by excludees, aliens seeking to enter the United States, and not by resident aliens whom the government seeks to expel. Excludees, although physically present in the United States, are "treated as if stopped at the border." [13] It is also important to recognize that the Service is required by statute to detain such unadmitted aliens if they are not clearly entitled to land [14] and that release on parole is an exception to the requirement of detention.[15] An unadmitted alien has no constitutional right to parole.[16]

■ This Court may only review discretionary agency decisions with respect to aliens seeking admission into the United States to determine whether the District Director has exercised his discretion and, if so, whether that discretion has been abused. Abuse may be found where the Service or Director has acted "irrationally or in bad faith" or "invidiously against a particular race or group." [17] As our Court of Appeals has held, discretionary parole decisions,

must be viewed at the outset as presumptively legitimate and bona fide in the absence of strong proof to the contrary. The burden of proving that discretion was not exercised or exercised irrationally or in bad faith is a heavy one and rests at all times on the unadmitted alien challenging denial of parole.[18]

■ Upon a review of this record, the Court finds that the District Director did not abuse his discretion in denying parole to any of the petitioners. A preliminary fact of significance is that not only did the petitioners seek to obtain entry into the United States by fraud—the use of fraudulent documents—but that after landing one-third of their number absconded who, to date, have not been apprehended. That circumstance alone justified concern that if the remainder were paroled, their subsequent appearance at required hearings would be doubtful. The risk of absconding in this case was not conjectural but was underscored by demonstrated experience. It was demonstrated not only by the escape of one-third of the initial group, but also by the circumstance that the entire group (including present petitioners) presented false documents which purported to establish that they were returning refugees to whom political asylum had previously been granted while in the United States and that their

---

11. 28 U.S.C. § 2243 (1982); *see Ex Parte Endo,* 323 U.S. 283, 304–07, 65 S.Ct. 208, 219–20, 89 L.Ed. 243 (1944) (once jurisdiction attaches, it is not ousted by subsequent transfer of petitioner); *see also Strait v. Laird,* 406 U.S. 341, 343, 92 S.Ct. 1693, 1694, 32 L.Ed.2d 141 (1972); *McCoy v. United States Bd. of Parole,* 537 F.2d 962 (8th Cir.1976); *Smith v. Campbell,* 450 F.2d 829, 831–32 (9th Cir.1971).

12. The motion made by the District Director to transfer this action to the Western District of Texas pursuant to 28 U.S.C. § 1404(a) must be denied, since it is clear that prior to the delivery of the detainees to the immigration authorities at El Paso, the action could not have been brought there. *See Van Dusen v. Barrack,* 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964); *Hoffman v. Blaski,* 363 U.S. 335, 344, 80 S.Ct. 1084, 1090, 4 L.Ed.2d 1254 (1960); *Shutte v. Armco Steel Corp.,* 431 F.2d 22 (3rd Cir.1970), cert. denied, 401 U.S. 910, 91 S.Ct. 871, 27

L.Ed.2d 808 (1971); *Bashir v. United States Attorney General,* 508 F.Supp. 1108, 1109 (E.D.Va. 1981) (habeas context); *see generally* 15 C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 3845 (1976).

13. *Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 215, 73 S.Ct. 625, 630, 97 L.Ed. 956 (1953).

14. 8 U.S.C. § 1225(b) (1982).

15. 8 C.F.R. § 212.5(a) (1984).

16. *See Landon v. Plasencia,* 459 U.S. 21, 32, 103 S.Ct. 321, 329, 74 L.Ed.2d 21 (1982).

17. *Bertrand v. Sava,* 684 F.2d 204, 212, 213 (2d Cir.1982).

18. *Id.* at 212–13.

histories and identities had been examined and verified.[19]

Petitioners contend that the District Director abused his discretion in denying their applications for parole which were in all cases based on the following claims: (1) that each petitioner would be a witness in pending immigration proceedings—his or her own; (2) that each petitioner's continued detention was not in the public interest since public monies would be required for his or her support; (3) that each petitioner had close family ties in the United States. Finally, where adult aliens were accompanied by children, release of the entire family was sought in many cases based on the child's detention.

The first two claims deserve little comment. Far from constituting an abuse of discretion to deny parole in the face of such claims, to grant parole for these reasons alone would be an abuse of discretion. Every alien is required to appear at his own exclusion hearing, and every detention requires government expenditures. There simply is no basis in the INS regulations or in logic to claim that it is an abuse of discretion to deny parole applications for these reasons.

The third claim—that petitioners had close family ties in the United States—is equally untenable. Under INS regulations, the existence of family ties within the United States may only justify parole where the family tie is a close relative. A close relative is defined by regulation as a parent, a spouse, children, or siblings. Moreover, the mere existence of family relationships is insufficient to mandate parole. The close family relative must be eligible to file and have filed a visa petition on behalf of

the detainee. Finally, even if both these criteria are met, the detainee only falls within the "category of aliens for whom the granting of the parole exception would be 'strictly in the public interest,' " if he or she presents neither a security risk nor a risk of absconding.[20]

None of the petitioners presented evidence to the District Director which would satisfy the foregoing regulations. In some cases, affidavits of support were offered by relatives who did not come within the regulations' definition of a close family tie. In other cases, petitioners alleged relatives falling within the definition, but presented no evidence that these relatives were eligible to file or had filed a visa petition on their behalf. Moreover, in denying parole, the District Director, as already noted, was justified to take into account the fact that 17 of the original group detained at the airport had absconded; and, at least with respect to some of the petitioners, that their prior applications for refugee status had already been denied overseas.

Finally, the fact that juveniles were detained with their parents does not justify, under the regulations, the parole of the entire family. If the family deemed it best to have the child removed from detention and a relative or friend in the United States could be found to sponsor the juvenile, then the regulations would support parole for the juvenile. It is only where a juvenile has been or will be held in custody for thirty days or more and apart from his family that the regulations require the District Director to consider paroling the juvenile with an accompanying adult in detention.[21] This is not the case here. Juveniles

19. See id. at 216.

20. 8 C.F.R. § 212.5(a)(2) (1984); id. § 212.-5(a)(2)(iii). Aliens who seek entry based on fraudulent documents may only be paroled pursuant to 8 C.F.R. § 212.5(a). See id. § 235.3(b); cf. id. § 212.5(b).

21. Id. § 212.5(a)(2)(iii). While petitioners emphasize the regulations' provision that "where it is impossible to accommodate a child of tender years accompanied by an adult or juvenile who will or has remained in detention for periods of

over 30 days, consideration should be given to paroling the juvenile with the accompanying adult to a responsible agency, relative, or friend," the context in which this language appears makes it clear that it applies to cases where detention of the juvenile separately from his parents is contemplated. Thus, the regulation begins: "Aliens who are defined as juveniles should only be placed in a juvenile facility or with an appropriate responsible agency or institution, recognized or licensed to accommo-

are in custody with their parents in a facility that petitioners do not dispute was certified to accommodate such family groups and which allows the families to remain together.

Accordingly, there is no basis for this Court to find that the District Director abused his discretion in denying petitioners' applications for parole.

 In addition to release, petitioners seek, by an amended pleading, an injunction mandating their return to New York. They claim that their transfer to Texas deprived them of their statutory right to counsel and their Fifth Amendment right to due process. Having retained New York counsel, petitioners claim that the INS was precluded from transferring them from New York.

There is no question that petitioners have a statutory right to representation by counsel of their choosing.[22] However, this does not foreclose a transfer of exclusion proceedings where neither the purpose nor the effect of the transfer deprives them of representation. There is no claim here that the INS transferred petitioners for the express purpose of undermining their representation by New York counsel. Petitioners present no facts challenging the Government's contention that the transfer was "completely justifiable" under the circumstances due to the unexplained breakdown in carrier custody security, the nonavailability of adequate detention facilities in this District, and the availability of secure family accommodations in Texas.

New York counsel who have represented petitioners thus far do not appear to have any special personal or professional relationship to any one of the petitioners. The hearings before the Immigration Court pending receipt of the advisory opinions from the State Department are yet to be held and no doubt will present matters which can as readily be handled by El Paso counsel as by New York counsel. No showing has been made that petitioners are unable to obtain counsel in the El Paso, Texas area if they so desire; indeed, it appears that competent counsel are available there.[23] Moreover, if the El Paso petitioners desired New York counsel (which incidentally does not appear to be the case—it is New York counsel, not petitioners, who urge the desirability of continued representation), there is no showing that the New York attorneys could not attend the exclusion hearings when scheduled in El Paso. Indeed, the attorneys' convenience and the fact that their offices are located in this District is of minimal significance.[24]

The essence of petitioners' argument appears to be that once they obtained counsel, the INS could not remove them from counsel's vicinity, thereby placing a burden on representation by that particular attorney. To accept petitioners' argument would in effect require this Court to grant unadmitted aliens rights which United States citizens do not have. Unadmitted aliens have no Sixth Amendment right to the effective assistance of counsel in exclusion proceedings.[25] If the INS is precluded from transferring unadmitted aliens once they have obtained counsel, but where other counsel are available in the transferee forum, then, those aliens have gained an unqualified right to representation by particular counsel. However, the Sixth Amendment does not provide that absolute right in criminal proceedings against Unit-

date juveniles by the laws of that State." *Id.* (emphasis added).

**22.** 8 U.S.C. § 1362 (1982).

**23.** *Cf. Louis v. Meissner,* 530 F.Supp. 924 (S.D. Fla.1981) (transfer of Haitian aliens to remote areas with no legal support and few interpreters).

**24.** *Cf. Leasing Service Corp. v. Rich Industrial Supply Corp.,* 456 F.Supp. 782, 784 (S.D.N.Y. 1978) (convenience of counsel is entitled to little weight on transfer of venue motion); *Faigenbaum Machinery, Inc. v. Scott & Williams, Inc.,* 344 F.Supp. 1267, 1272 (S.D.N.Y.1972) (same).

**25.** *See Ramirez v. INS,* 550 F.2d 560, 563 (9th Cir.1977); *Barthold v. United States Immigration and Naturalization Service,* 517 F.2d 689, 691 (5th Cir.1975) and cases cited therein.

ed States citizens.[26] Such an incongruous result is compelled neither by the immigration laws, nor by the Fifth Amendment's guarantee of fundamental fairness in adjudicative processes.[27]

Accordingly, petitioners' applications for release from custody and for injunctive relief are denied.

So ordered.

26. *See Morris v. Slappy,* 461 U.S. 1, 12–14, 103 S.Ct. 1610, 1616–17, 75 L.Ed.2d 610 (1983); *id.* at 25, 103 S.Ct. at 1623 (Brennan, J., concurring).

27. "Constitutional due process requirements under the Fifth Amendment are satisfied by a full and fair heaing." *Ramirez v. INS,* 550 F.2d 560, 563 (9th Cir.1977). "To render a hearing unfair ... the practice must have been such as might have led to a denial of justice." *United States ex rel. Bilokumsky v. Tod,* 263 U.S. 149, 157, 44 S.Ct. 54, 57, 68 L.Ed. 221 (1923) (Brandeis, J.)