Carlos Amilcar Umanzor UMANZOR,
Petitioner-Appellant,

v.

David H. LAMBERT, District Director,
U.S. Immigration and Naturalization
Service, Defendant-Appellee.

No. 84–3393.

United States Court of Appeals,
Fifth Circuit.

Feb. 18, 1986.

Brown, Circuit Judge, dissented with opinion.

Catherine Lampard, Timothy G. Keating, New Orleans, La., for petitioner-appellant.

John Volz, U.S. Atty., Louis Moore, Jr., W. Glenn Burns, P. Kevin Colomb, Eneid A. Francis, Asst. U.S. Attys., New Orleans, La., for defendant-appellee.

Before CLARK, Chief Judge, BROWN and GEE, Circuit Judges.

GEE, Circuit Judge:

Carlos Umanzor, a citizen of El Salvador, was arrested and charged in March 1983 for having illegally entered the United States. He remained in the custody of the Immigration and Naturalization Service (INS) from that time until his ultimate deportation on October 14, 1983.

In June,[1] before his deportation, Umanzor applied for political asylum. This request was denied, and Umanzor appealed to the Board of Immigration Appeals (BIA). On July 30, while the appeal was pending, Umanzor's attorney of record, Evangeline Abriel of Ecumenical Immigration Services (a New Orleans pro bono legal services organization), informed the INS that she would no longer be associated with Ecumenical and that a Catherine Lampard was replacing her. Umanzor, however, was not mentioned in this letter, and Abriel remained his counsel of record.

On October 5 the BIA affirmed the denial of political asylum and mailed, the same day, a copy of the decision to counsel of record, Abriel. She received the decision on October 10 at her office at Loyola University and forwarded it to Lampard of Ecumenical Immigration Services. Lampard received the decision on October 12. In the noon hour the next day, the 13th, the INS telephoned Abriel and informed her that Umanzor was scheduled to be deported that afternoon at 2:00 p.m. on a commercial airline flight leaving the New Orleans International Airport (Moisant Field) for Central America. Abriel immediately telephoned Lampard with this information.

Lampard arrived at the INS office at 1:30 p.m., enrolled as counsel of record, and

---

1. All dates are 1983 unless otherwise indicated.

was told that Umanzor's departure had been delayed until 5:30 a.m. the next morning. Lampard contends she verbally petitioned the District Director to stay the deportation so that she could seek judicial review. The INS denies that she made such a request. The district court did not resolve this dispute.

The next morning, on October 14, Umanzor's flight was again delayed, becoming airborne at 10:23 a.m. Lampard filed a petition for a writ of habeas corpus in the district court at 10:27 a.m.; a time when Umanzor was still in United States airspace.

The district court dismissed the petition, reasoning that by the time the habeas petition was filed Umanzor was beyond the custody of the INS and that consequently habeas jurisdiction failed to attach. In addition, the district court noted, 8 U.S.C. § 1105a(c) bars judicial review of a deportation order once the alien has departed the United States. Umanzor, still outside of the United States so far as the record shows, appeals the district court's dismissal of his petition.

### I. Mootness

■ A threshold question is whether this matter has been mooted by Umanzor's release by the airline (assuming that the airline did have custody of Umanzor for habeas purposes). To satisfy Article III of the Constitution, an actual case or controversy must exist at all stages of judicial review.[2] *Brown v. Liberty Loan Corporation of Duval,* 539 F.2d 1355, 1358 (5th Cir.1976). If the subject of an appeal has become moot, the appellate court may not decide it. *H.K. Porter Co., Inc. v. Metropolitan Dade County,* 650 F.2d 778, 782 (5th Cir.1981).

Under *Carafas v. LaVallee,* 391 U.S. 234, 237–38, 88 S.Ct. 1556, 1559–60, 20 L.Ed.2d 554 (1968) and its progeny in this Circuit, a prisoner's release from custody does not moot his habeas petition where he could suffer adverse collateral consequences, that is, disabilities or burdens which may flow from his conviction that give him a substantial stake in the judgment of conviction, one which survives the satisfaction of the imposed sentence. *Escobedo v. Estelle,* 655 F.2d 613, 615 (5th Cir.1981). Indeed, the "mere possibility of adverse collateral consequences is sufficient to preclude a finding of mootness." *Sibron v. New York,* 392 U.S. 40, 55, 88 S.Ct. 1889, 1899, 20 L.Ed.2d 917 (1968).

■ Umanzor may very well suffer collateral consequences from his deportation. 8 U.S.C. § 1182(a)(17) provides that aliens who have been arrested and deported and who seek readmission within five years are ineligible for visas and shall be excluded from admission into the United States. 8 U.S.C. § 1326 provides that any deported alien who later enters, attempts to enter, or is found in the United States shall be guilty of a felony, one punishable by a fine or imprisonment or both.[3] The very real possibility of collateral consequences, then, requires us to find that this appeal has not been mooted for purposes of Article III of the Constitution by the airline's release of Umanzor.

### II. Was Umanzor "In Custody" So That Habeas Jurisdiction Attached?

■ 8 U.S.C. § 1105a(a)(9) provides that "any alien held in custody pursuant to an order of deportation may obtain judicial review thereof by habeas corpus proceedings." The district court held that because the INS had given custody of Umanzor to the airline minutes before the habeas petition was filed, habeas jurisdiction did not attach.

---

2. Whether there exists an Article III case or controversy, and thus Constitutional subject-matter jurisdiction, is analytically distinct from whether the pertinent habeas statutes confer statutory subject-matter jurisdiction. See *Escobedo v. Estelle,* 655 F.2d 613, 615 n. 5 (5th Cir.1981).

3. Nor can a deported alien collaterally attack his original deportation order if he is later prosecuted for illegal reentry. See *United States v. De la Cruz-Sepulveda,* 656 F.2d 1129, 1131 (5th Cir.1981).

Although the Supreme Court has expanded the concept of custody for general habeas proceedings beyond situations in which the petitioner is in actual physical custody, *Justices of Boston Municipal Court v. Lydon*, 466 U.S. 294, 104 S.Ct. 1805, 1809–10, 80 L.Ed.2d 311, 319–20 (1984), we have held that Congress intended "held in custody" as used in § 1105a(a)(9) to require "actual, physical custody in a place of detention." *United States ex rel Marcello v. District Director of I.N.S.*, 634 F.2d 964, 969 (5th Cir.1981).

Nevertheless, the Supreme Court has recognized that a habeas petitioner can be in custody of the entity or individual against whom the writ is directed through that entity's or person's agent. In *Braden v. Thirtieth Judicial Circuit Court of Kentucky*, 410 U.S. 484, 489 n. 4, 93 S.Ct. 1123, 1126 n. 4, 35 L.Ed.2d 443 (1973), the Court concluded that an Alabama warden holding the petitioner pursuant to a Kentucky detainer was Kentucky's agent, and thus that the petitioner was "in custody" of the Kentucky respondent for purposes of a habeas petition filed in a Kentucky federal district.

> The writ of habeas corpus does not act upon the prisoner who seeks relief, but upon the person who holds him in what is alleged to be unlawful custody [citation omitted]. So long as the custodian can be reached by service of process, the court can issue a writ within its jurisdiction requiring that the prisoner be brought before the court for a hearing on his claim, or requiring that he be released outright from custody, even if

the prisoner himself is confined outside the court's territorial jurisdiction. *Id.*, 410 U.S. at 494–495, 93 S.Ct. at 1129–30.

We have little difficulty in concluding that Umanzor was under actual physical restraint by the government's agent—the airline—at the moment the habeas petition was filed. Umanzor was imprisoned inside of the aircraft, against his will, until the aircraft completed the flight and he was released. Since the district court had jurisdiction over the INS director against whom the writ issued, habeas jurisdiction attached.[4]

### III. Subject Matter Jurisdiction Under 8 U.S.C. § 1105a(c)

■ Having concluded that this matter was not mooted by the airline's release of Umanzor and that habeas jurisdiction attached at the district court when the petition was filed, we must next inquire whether the district court's—and our—jurisdiction over this matter has been curtailed by Congress. 8 U.S.C. § 1105a(c) provides, in pertinent part, that: "An order of deportation ... shall not be reviewed by any court if [the alien] has departed from the United States after the issuance of the order." The statute's command is unequivocal. See *Asai v. Castillo*, 593 F.2d 1222, 1223–24 (D.C.Cir.1978) (where alien petitioners departed the United States after having filed habeas petition challenging deportation orders, the appeals were dismissed pursuant to § 1105a(c)).

Umanzor argues, however, that when the alien's departure was effected by the government, "departure" as used in

---

**4.** A case remarkably similar to the facts at bar is *Ledesma-Valdes v. Sava*, 604 F.Supp., 675 (S.D. N.Y.1985). In this case, aliens being deported boarded an airliner at LaGuardia Airport in the *Eastern District* of New York literally moments before a habeas petition was filed in the district court for the *Southern District* of New York. The plane then took off. Minutes later, a Southern District judge signed the petition. The aliens-turned-petitioners were flown to Texas where they awaited final deportation. The government moved to dismiss for want of habeas jurisdiction in New York.

The district court, citing *Braden*, rejected the government's argument and denied the motion.

The court declared "the issue ... is not where respondent placed the petitioners while they were in his custody, but whether the Court had jurisdiction over respondent as petitioners' custodian at the time the petition was filed and the order to show cause served." 604 F.Supp. at 679. The court held that it had jurisdiction over the respondent, the I.N.S. Director, and that the I.N.S. had custody over the petitioners through the airline and the I.N.S. agents who accompanied the petitioners aboard the aircraft. *Id.* Of course, in the present case, no I.N.S. officials accompanied Umanzor aboard the airline, but we think this a distinction without significance.

§ 1105a(c) is limited to "legally executed departures." The authority for this proposition is *Mendez v. I.N.S.*, 563 F.2d 956, 958 (9th Cir.1977), and *Zepeda-Melendez v. I.N.S.*, 741 F.2d 285, 287 (9th Cir.1984). In both cases it was held that, since no notice of deportation was given to the alien's attorney, the alien was deprived of his right to counsel under 8 U.S.C. § 1252(b) and the departures were effected illegally.

We entertain serious reservations regarding the *"Mendez* exception" for, if the exception is taken to its logical conclusion, *any* error or procedural defect at any point in the alien's deportation saga (from his arrest, hearing, BIA hearing, habeas proceeding in district court or appeal to the appropriate circuit court, to his final departure from the United States) would render the departure illegal. This being so, any later *allegation* of procedural error by a deported alien would force the district court and the circuit courts to review the entire matter, despite the express determination of Congress that no such reviews should take place.[5]

We need not cross that Rubicon today, however, because even were we to adopt the *Mendez* exception, there is no evidence in this case that Umanzor's departure was effected illegally. Any alien subject to a final order of deportation has six months[6] to file a petition for review in the appropriate circuit court.[7] Filing such a petition effects an automatic stay of the alien's deportation.[8] If the alien is "held in custody pursuant to an order of deportation," he may also seek a writ of habeas corpus in the appropriate district court.[9] But, in any event, the right of judicial review of a final deportation does not require the I.N.S. to defer deportation of an alien. The burden is on the alien to obtain a stay.[10]

Assuming that due process requires that an alien's attorney be notified of the deportation, Umanzor's attorney was notified of the deportation some 22 hours in advance of his actual departure. We therefore cannot say that the district court's finding that Lampard could have obtained a stay in the intervening hours from this court in a direct appeal, or through a timely habeas application in the district court, is clearly erroneous.

■ Even though the district court made no finding, we assume arguendo that Umanzor's attorney, Lampard, verbally petitioned the I.N.S. District Director for an administrative stay of the deportation pursuant to 8 C.F.R. § 243.4,[11] and that this

---

5. Our reservations regarding the *Mendez* exception are reinforced by the course of its development in the circuit of its origins, the Ninth, where *Mendez* has become a sinkhole that has swallowed the rule of § 1105a(c). See *Thorsteinsson v. I.N.S.*, 724 F.2d 1365, 1367 (9th Cir.1984) (record of deportation hearing examined to determine whether the petitioners were unlawfully deported by being denied effective assistance of counsel); *cf. Estrada-Rosales v. I.N.S.*, 645 F.2d 819, 820–21 (9th Cir.1981) (deported alien permitted to attack a deportation order based on an invalid conviction); and *cf. United States v. Calderon-Medina*, 591 F.2d 529, 530 (9th Cir.1979) (deported alien allowed to collaterally attack the deportation order when he was deported without being permitted to contact his embassy).

Even so, we note that the Sixth Circuit has unequivocally embraced *Mendez, Juarez v. I.N.S.*, 732 F.2d 58, 59–60 (6th Cir.1984), while the Third has at least indicated a willingness to do so. *Newton v. I.N.S.*, 622 F.2d 1193, 1195 (3d Circuit 1980).

Finally, this Court has arguably alluded to the exception in dicta in a footnote. *Haitian Refugee Center v. Smith*, 676 F.2d 1023 (5th Cir.1982) at f.n. 48.

6. 8 U.S.C. § 1105a(a)(1).

7. 8 U.S.C. § 1105a(a)(2).

8. 8 U.S.C. § 1105a(a)(3).

9. 8 U.S.C. § 1105a(a)(9).

10. *8 U.S.C. § 1105a(a)(7).*

11. 8 C.F.R. § 243.4 (1984) provided, in pertinent part:

§ 243.3 Stay of Deportation.

Any request of an alien under a final administrative order of deportation for a stay of deportation, except a request for withholding of deportation pursuant to Section 243(h) of the Act, shall be filed on Form I–246 with the district director having jurisdiction over the place where the alien is at the time of filing. The district director, in his discretion, may grant a stay of deportation for such time and under such conditions as he may deem appro-

request was denied. In deportation proceedings, denials of discretionary relief are reviewed narrowly. Due process is satisfied if the discretion was not exercised in an arbitrary and capricious manner. *Tuan v. I.N.S.*, 531 F.2d 1337, 1338 (5th Cir.1976). There is no evidence in the record to suggest that the I.N.S. Director's denial of a stay of deportation was an abuse of discretion.

## IV. The Constitutionality of 8 U.S.C. § 1105a(c)

■ Article I, Section 9, Paragraph 2 of the Constitution provides that: "The privilege of the writ of habeas corpus shall not be suspended unless wherein cases of rebellion or invasion the public safety may require it." Does this bar Congress from removing the district court's—and our—jurisdiction over Umanzor's habeas application through 8 U.S.C. § 1105a(a)(c)?

Article III, Section 1 of the Constitution vests the judicial power of the United States in a Supreme Court "and in such inferior courts as the Congress may from time to time ordain and establish." As one scholarly commentator has remarked, "It is this statement, coupled with its history, that has consistently supported the conclusion that Congress not only has power over lower federal court jurisdiction but that this power is in essence *plenary*." Uddo, "A Wink from the Bench: The Federal Courts and Abortion." 53 Tul.L.Rev. 398, 400 (1979) (emphasis added).

In *Palmore v. United States*, 411 U.S. 389, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973), the Supreme Court declared:

The decision with respect to inferior federal courts, as well as the task of defining their jurisdiction, was left to the discretion of Congress. That body was not constitutionally required to create inferior Article III courts to hear and decide cases within the judicial power of the United States, including those criminal cases arising under the laws of the United States. Nor, if inferior federal courts were created, was it required to invest them with all the jurisdiction it was authorized to bestow under Article III. *Id.* 411 U.S. at 400–01, 93 S.Ct. at 1677–78.

Accordingly, it is clear that Congress is constitutionally empowered to curtail the habeas jurisdiction of the lower federal courts if it so chooses. Congress has so chosen, and we obey its command. Like pregnancy, jurisdiction admits of no qualification. Thus, while it might be satisfying to join the dissent in discovering that we have a little bit of jurisdiction in extreme cases, we conclude that such a course would be for Congress, not for us.

## Conclusion

Habeas jurisdiction attached at the district court since Umanzor was "in custody" of the INS's agent, the airline, at the moment the habeas application was filed. The habeas petition has not since been mooted by the airline's release of Umanzor, because Umanzor could suffer adverse collateral consequences from his deportation. However, the district court was, and we are, precluded by Congress from reviewing the merits of Umanzor's claims since he has since departed from this country. Finally, it was within the scope of Congress's constitutional authority for it to remove habeas jurisdiction from the district court and this Court. The district court's dismissal of Umanzor's habeas petition is therefore

AFFIRMED.

JOHN R. BROWN, Circuit Judge, dissenting:

The Court, after correctly determining that the District Court had jurisdiction of Umanzor's habeas petition, affirmed the District Court's dismissal of the petition on the basis of § 1105a(c). Because I do not

priate. Written notice of the disposition of the alien's request shall be served upon him and any notice of denial shall include specific reasons therefor; however, neither the making of the request nor the failure to receive

notice of disposition with any outstanding notice to surrender for deportation. Denial by the district director of a request for a stay is not appealable ...

think § 1105a(c) supports the District Court's dismissal, I respectfully dissent from Part III of this Court's opinion and the Court's resulting affirmance of the District Court.

This is the first time this Circuit has been asked to construe the word "departed" in 8 U.S.C. § 1105a(c) and I would not sidestep the issue as the Court apparently does. Rather, I would adopt the interpretation of "departed" espoused by recent Ninth Circuit decisions which, I believe, when applied to the facts surrounding Umanzor's deportation, calls for a reversal of the District Court.

8 U.S.C. § 1105a(a)(1) provides for a six month period during which a petition for review of a final deportation order may be filed. However, 8 U.S.C. § 1105a(c) precludes judicial review of a deportation order if an alien has "departed from the United States after the issuance of the order." The question presented in this case is whether a departure stimulated and effected by the peremptory action of immigration authorities in disregard of, or indifference to, an alien's statutory guarantees is a "departure" under § 1105a(c).

Our brothers on the Ninth Circuit decided in so many words that "departure" cannot mean "departure in contravention of due process" and held that only "legally executed" departures act as a bar to judicial review under § 1105a(c). *Mendez v. Immigration & Naturalization Service,* 563 F.2d 956, 958 (9th Cir.1977). However, the Court in this case, while not rejecting the Ninth Circuit's construction, certainly has not given it the Fifth Circuit Seal of Approval. This attitude, in my opinion, gives the Immigration and Naturalization Service (INS) license to rush the deportation of aliens with the sole purpose of defeating the aliens' statutory right to judicial review. I am confident the court would not accept an interpretation of § 1105a(c) that would allow *any* departure to bar judicial review. To so rule would mean that as soon as a deportation order issued, the INS could presumably abduct the alien and remove him from the country, thereby cutting off his statutory right to judicial review on the grounds that the alien has "departed." Such an interpretation would render the statutory right to judicial review meaningless.

Where then is the line to be drawn? I believe that the question is important enough that we should answer it now and clarify exactly what procedures the INS is permitted to employ in order to effect an alien's "departure," which automatically cuts off his statutory right to judicial review of a deportation order. This calls for an examination of the Ninth Circuit cases applying the *Mendez* interpretation of "departure."

In *Mendez,* the alien's attorney received *no* notice of the order to report for deportation, even though such notice is required by 8 C.F.R. § 292.5(a). According to the Ninth Circuit, the failure to notify counsel amounted not only to a violation of 8 C.F.R. § 292.5(a), but also a violation of the alien's statutory right to counsel in 8 U.S.C. § 1252(b). The Court in *Mendez* thus found that the alien's departure was not legally executed. 563 F.2d at 958–59. Allowing the INS to effect such a "departure" without notifying the alien's attorney would thwart an appellate court's jurisdiction to review deportation orders. *Id.* See also *Zepeda-Melendez v. INS,* 741 F.2d 285 (9th Cir.1984).

I think the Ninth Circuit in *Mendez* was absolutely correct in deciding that a departure cannot bar judicial review when the alien's lawyer has received no notice of the order to report for deportation and thus is afforded no opportunity to file a petition for review which would automatically stay the deportation. The statutory structure of § 1105a also supports the *Mendez* decision. If § 1105a(c) "departure" encompassed *all* departures regardless of whether the alien's attorney has been properly notified, the six month grace period to file a petition for review of a deportation order would be rendered meaningless. Congress cannot have intended for such an anomaly to exist in the statutory scheme of § 1105a.

The Court, in the majority opinion, does not suggest that *Mendez* is wrong. Rather, the *"Mendez* exception" is criticized because it has allegedly resulted in a "sinkhole" that has swallowed the departure rule of § 1105a(c). It is interesting that in the nine years since the decision in *Mendez*, this "sinkhole" apparently consists of only four cases in which an issue arose as to whether an alien's departure was "illegally executed." Moreover, adopting the *Mendez* exception does not have to lead to the parade of horribles feared by the Court whereby any error or defect in the alien's deportation saga (including his arrest, hearing, BIA hearing, appeal, and final departure) would render his departure illegal. Since this issue is one of first impression in our Circuit, we have a blank slate in front of us and can therefore fashion a rule which would alleviate the Court's legitimate concerns. Accordingly, I would restrict the *Mendez* exception to those situations for which it was originally intended—when the alleged illegality intimately touches the departure itself. This rule, I think, reflects the plain meaning of "illegally executed departure" in *Mendez*.

Applying this rule to the present case demonstrates that Umanzor's departure was "illegally executed." This is not a case where an alien claims that improprieties in his arrest, hearing, etc. have rendered his subsequent departure illegal. Rather, this is exactly like *Mendez*—that is, the claimed illegality intimately touches the departure itself. Granted, the illegality in *Mendez* was more egregious. In *Mendez*, the alien's attorney received *no* notice of the order to report for deportation while in the present case the attorney was notified a few hours before the scheduled deportation. Thus, this is not a case of *no* notice; rather, it is a case of *insufficient* notice.

However, when the notice is, as a practical matter, insufficient, the alien is as effectively deprived of his statutory right to counsel as if his attorney had received no notice, and the appellate court is divested of congressionally ordained jurisdiction to review INS deportation orders, thereby resulting in the loss of the alien's statutory right to judicial review.

A close examination of the facts surrounding Umanzor's deportation and a glance at § 1105a(c) and its legislative history indicates that the INS should not be allowed to effectuate a "departure" in the manner employed here. The INS mailed notice of the BIA's denial of Umanzor's appeal[1] to his former attorney (Abriel) who received it on October 10, 1983 and forwarded it to the proper attorney (Lampard) who did not receive it until October 12.[2] This occurred only one day before Umanzor was scheduled to be deported, and at a time when neither of the attorneys had any awareness of INS plans to effect deportation immediately.

The first actual notice of Umanzor's departure was not received by Attorney Abriel until the afternoon of October 13—the very day Umanzor was scheduled to leave. Attorney Lampard received notice only because of Abriel's telephone call. In other words, the two attorneys became aware of the deportation less than *two hours* before the scheduled time of departure. Considering the size of New Orleans, this two hour "window of opportunity" was woefully inadequate. It was as though no notice had been given.

The conduct of INS—and indeed its noncompliance with requirements of adequate notice—is not excused by the fortuitous fact that the flight on which Umanzor was

---

**1.** The Ninth Circuit has ruled, correctly I believe, that notice of the BIA's denial of an alien's appeal does *not* constitute constructive notice of deportation. In other words, actual notice of deportation is required. *See Zepeda-Melendez v. INS,* 741 F.2d 285 (9th Cir.1984).

**2.** Abriel, an attorney for Ecumenical Immigration Services (EIS), filed the BIA appeal on June 17, 1983. Ms. Abriel later informed the INS

that she would be changing jobs on August 1, 1983, and that Lampard would assume the position of attorney for EIS as of August 15, 1983. Therefore, in addition to the untimeliness of the relevant notices, they were also being sent to the wrong attorney. This constitutes another shortcoming of the INS handling of the Umanzor affair.

to depart was subsequently delayed until the following morning. Nor is it excused by the fact that during these unpredictable hours of leeway, Attorney Lampard could have obtained a stay by filing a petition for review with the Court of Appeals on Camp Street. Instead, she spent time researching her alternatives and preparing a habeas corpus petition to be filed in the District Court. As it turns out, this petition was filed and a stay of deportation was granted about four minutes after Umanzor's flight was airborne. Granted, she could have filed a direct appeal and obtained an automatic stay in less time than it took to file a petition for habeas corpus. I do not, however, think that our analysis should focus on whether a scenario exists whereby the attorney "could have" obtained a stay. Since the proper inquiry is whether the departure was "legally executed" and not effected "in contravention of due process," the resolution depends upon the INS's actions and *not* on whether the attorney "could have" somehow performed her function in the face of improper agency action. Any other rule would encourage the INS to "race to deportation" confident that judicial review could be barred.

The "hurry up" atmosphere created by the INS does not serve the legislative purpose underlying § 1105a. The legislative history of § 1105a indicates that the "departure" rule of § 1105a(c) was intended to eliminate repetitious and unjustified appeals. H.R.Rep. No. 1086, 87th Cong., 1st Sess., *reprinted in* U.S.Code Cong. & Ad. News 2950, 2971–72. The six month limit for filing an appeal was considered "sufficient and far beyond the realms of any claim of unfairness for an alien to determine whether he really has a case upon which he should seek judicial review and to prepare therefor." *Id.* at 2973. Umanzor's attorney had less than one day to make this critical determination. Of greater concern, however, is that allowing the INS to adopt a "beat the clock" approach actually encourages the filing of frivolous appeals or habeas petitions. Without a reasonable amount of time to carefully examine the BIA decision, research alternative courses, and discuss these alternatives with the alien, an attorney faced with the enforced departure of an alien in a matter of hours has to lash out with precipitous legal action simply to preserve the alien's right to judicial review. This approach results in exactly what § 1105a was designed to prevent—the filing of repetitious and unjustified legal proceedings. Allowing the course pursued here by the INS will ensure that a petition for review (or for habeas) is automatically filed in every case immediately after the BIA renders its decision, regardless of whether there is any merit in doing so.

For all the preceding reasons, I would hold that Umanzor's departure was not legally executed but was effected in contravention of due process. That being so, the District Court erred in dismissing Umanzor's petition for habeas corpus. Accordingly, I must dissent.