**Junior Earl POTTINGER, Petitioner,**

v.

**Janet RENO, Attorney General, U.S., Doris Meissner, Commissioner, Immigration and Naturalization Service, Edward McElroy, New York District Director, Immigration and Naturalization Service, John B.Z. Caplinger, New Orleans District Director, Immigration and Naturalization Service, Immigration and Naturalization Service, U.S. Department of Justice, Respondents.**

**No. 97 CV 3217 JBW.**

United States District Court,
E.D. New York.

Aug. 2, 1999.

Bretz and Associates, New York City By Alan Strauss, for Petitioner.

Zachary W. Carter, United States Attorney, Eastern District of New York, Brooklyn, NY By Scott Dunn, Mary Elizabeth Delli–Pizzi, for Respondents.

## MEMORANDUM AND ORDER

WEINSTEIN, Senior District Judge.

TABLE OF CONTENTS

I. INTRODUCTION ...................................................351

II. FACTS ........................................................352
 A. AEDPA's Restrictions on Section 212(c) Discretionary Relief from Depor-
 tation.....................................................352
 1. Retroactivity of Section 440(d) ........................354
 2. Substantive Issues Left Open in *Henderson* and *Mojica* ..................354
 B. Mr. Pottinger's Situation ........................................355

III. HISTORICAL, CONSTITUTIONAL AND INTERNATIONAL LAW BACK-
 GROUND .......................................................356

IV. JURISDICTION TO ISSUE A WRIT OF HABEAS CORPUS .................356
 A. Subject Matter ............................................356
 B. Personal Jurisdiction and Venue .....................................356

V. PRESUMPTION AGAINST RETROACTIVE APPLICATION...................357
 A. *Chevron* ...............................................358
 B. AEDPA Section 440(d) .........................................359
 C. Rule of Lenity ...........................................363
 D. Constitutional Issues ..........................................363

VI. CONCLUSION ...................................................364

## I. INTRODUCTION

Petitioner brings a case of first impression raising some of the same substantive issues as *Maria v. McElroy*, 98 CV 3287 (E.D.N.Y.Aug. 27, 1999). This memorandum is intended to be considered together with the one in *Maria* and that in *Mojica v. Reno*, 970 F.Supp. 130 (E.D.N.Y.1997), *aff'd sub nom. Henderson v. I.N.S.*, 157 F.3d 106 (2d Cir.1998), *cert. denied sub nom. Navas v. Reno*, — U.S. —, 119 S.Ct. 1141, 143 L.Ed.2d 209 (1999). For the convenience of the reader, there is some repetition among these memoranda. All deny retroactivity to the recently enacted provisions prohibiting those deportable due to conviction of one of a number of specified crimes from applying for humanitarian relief from deportation. For purposes of their eligibility for such relief, petitioners in all these cases should be treated as if the laws governing their rights were those in effect at the time they committed the crimes for which the government now seeks to deport them. Those laws afforded this petitioner, Junior Earl Pottinger, a right to a humanitarian hearing to avoid deportation.

Mr. Pottinger is a lawful permanent resident who has lived continuously in the United States with his family since childhood. He was admitted at age three and was raised and developed into young adulthood here. He was placed in deportation proceedings after entering a guilty plea for attempted sale of a controlled substance.

Prior to the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104–132, 110 Stat. 1214, section 212(c) of the Immigration and Naturalization Act entitled long time legal residents like Mr. Pottinger (with the exception of those convicted of a small number of particularly serious crimes and sentenced to a minimum of five years in prison) to a hearing before an immigration judge empowered to grant discretionary waivers of deportation based on equitable humanitarian considerations. Section 440(d) of AEDPA altered this established practice by barring lawful permanent residents convicted of any of a multiplicity of offenses from applying for this form of relief, traditionally referred to as section 212(c) relief.

*Mojica v. Reno*, 970 F.Supp. 130 (E.D.N.Y.1997), a closely related case de-

cided two years ago, held that AEDPA's restrictions on section 212(c) relief could not retroactively be applied to lawful permanent residents who had been convicted and placed in deportation proceedings prior to AEDPA's enactment. The court of appeals for the Second Circuit affirmed. *See Henderson v. I.N.S.*, 157 F.3d 106 (2d Cir.1998). It held that Congress had not designed section 440(d) to apply to persons whose deportation proceedings were pending at the time AEDPA was signed into law. The court expressly declined in *Henderson* to reach the question now squarely presented by the *Maria* and *Pottinger* cases, in both of which deportation proceedings were commenced after AEDPA's adoption: section 440(d)'s applicability to pre-enactment criminal conduct and convictions. In a forthcoming opinion, the reason why Mr. Maria is entitled to the same relief as the *Mojica* petitioners will be explicated. This memorandum deals with Mr. Pottinger's entitlement to such relief.

In this case, as in *Mojica*, the temporal reach of AEDPA section 440(d) is determined on the basis of standard statutory interpretation as further informed by constitutional and international human rights principles. Because the same fundamental principles of statutory construction, deep constitutional values, national traditions and international obligations relied upon in *Mojica* are implicated here, the extensive analysis of these matters in that case should be deemed expressly incorporated in this memorandum. *See Mojica*, 970 F.Supp. at 142–55; *see also Maria*, No. 98 CV 3287 (E.D.N.Y. Aug. 27, 1999).

Resolution of Mr. Pottinger's claim that AEDPA section 440(d) violates the Equal Protection Clause by impermissibly discriminating between deportable and excludable aliens, denying section 212(c) relief only to the former group, is unnecessary to the disposition of this case.

## II FACTS

### A. AEDPA's Restrictions on Section 212(c) Discretionary Relief from Deportation

Mr. Pottinger challenges a BIA ruling finding him ineligible for section 212(c) relief under AEDPA section 440(d). The nature and history of section 212(c) relief is set forth in detail in *Mojica. See* 970 F.Supp. at 136–38. The salient points of this discussion are reviewed and supplemented here and in the *Maria* opinion for convenience.

The right of a long term lawful permanent resident convicted of a deportable offense to apply for relief from deportation was conclusively established over four decades ago by the Immigration and Nationality Act of 1952(INA), Pub.L. No. 82–414, 55 Stat. 163. Its origins may be traced to Section 3 of the Seventh Proviso of the Immigration Act of 1917. *See Francis v. I.N.S.*, 532 F.2d 268, 270 (2d Cir.1976); *Goncalves v. Reno*, 144 F.3d 110, 128 (1st Cir.1998), *cert. denied sub nom. Reno v. Pereira Goncalves*, —— U.S. ——, 119 S.Ct. 1140, 143 L.Ed.2d 208 (1999) (same). The INA comprehensively revised and recodified prior immigration statutes, substantially expanding the grounds for deportation and exclusion. *See* Craig H. Feldman, Note, *The Immigration Act of 1990: Congress Continues to Aggravate the Criminal Alien*, 17 Seton Hall Legis. J. 201, 203 & n.14 (1993).

In order to mitigate the severity of the new law, Congress created a form of discretionary relief from deportation for permanent residents with "a lawful unrelinquished domicile of seven consecutive years in the United States." INA § 212(c), 8 U.S.C. § 1182(c) (1994) (repealed 1996). *See* Anjali Parekh Prakash, Note, *Changing the Rules: Arguing Against Retroactive Application of Deportation Statutes* 72 N.Y.U. L.Rev. 1420, 1428 (1997) (citing Dan Kesselbrenner & Lory D. Rosenberg, *Immigration Law and Crimes* § 11.1, at 11–2 (1994)).

Though facially limited to exclusion proceedings, a series of judicial decisions interpreted section 212(c) as applicable to deportation proceedings as well. *See, e.g., Francis v. I.N.S.*, 532 F.2d 268 (2d Cir. 1976) (resident aliens in both exclusion and deportation proceedings eligible for 212(c) relief); *Matter of Silva*, 1976 WL 32326, 16 I.&N. Dec. 26 (BIA 1976) (applying *Francis* nationwide).

Prior to the enactment of AEDPA in 1996, the only lawful permanent residents barred from applying for a 212(c) waiver were those who had served five or more years in prison in connection with an "aggravated felony" conviction. *See* Immigration Act of 1990, Pub.L. No. 101–649, § 511(a), 104 Stat. 4978, 5052, *amended by* the Miscellaneous and Technical Immigration and Naturalization Amendments of 1991, Pub.L. No. 102–232, § 306(a)(10), 105 Stat. 1733, 1751 (imposing limitation on § 212(c) relief). Outside this narrow exception,

> A long-term permanent resident accused of any crime triggering deportability could ... be assured that, even if he or she pled guilty or was convicted in criminal proceedings after the trial, there would be available a waiver of deportation in subsequent deportation proceedings before an Immigration Judge. The Immigration Judge's decision to grant the waiver depends upon a weighing of many factors. Among the favorable elements considered by the Immigration Judge under section 212(c) are family ties within the United States, residence of long duration in this country (particularly when the inception of residence occurred at a young age), evidence of hardship to the individual and family if deportation were to occur, service in this country's armed forces, a history of employment, existence of property or business ties, evidence of value and service to the community, proof of rehabilitation, and other evidence attesting to an individual's good character and likeli-

hood of future positive contributions to American society.

*Mojica*, 970 F.Supp. at 137 (citations omitted); *see also Lovell v. I.N.S.*, 52 F.3d 458, 461 (2d Cir.1995) (listing 212(c) factors); *Matter of Marin*, 16 I. & N. Dec. 581, 584–85 (BIA 1978) (same). Some fifty percent of those seeking a 212(c) waiver were granted relief. *See Mojica*, 970 F.Supp. at 178 (citing U.S. Department of Justice Executive Office for Immigration Review Statistical Sheet 1, Jan. 19, 1995). Long term residents convicted of a minor offense may have been even more likely to receive a waiver.

The enactment of AEDPA on April 24, 1996 dramatically changed this scenario by precluding 212(c) relief for persons rendered deportable by conviction of an offense falling within one of a number of broad categories of crimes, among them "aggravated felonies" and drug offenses. AEDPA § 440(d), 110 Stat. at 1277. *See generally Mojica*, 970 F.Supp. at 137, Anjali Prakesh, *supra*, at 1431–33. Section 440(d), if applicable to Mr. Pottinger, would bar him from applying for section 212(c) relief.

On September 30, 1996, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) was enacted. Pub.L. No, 104–208, 110 Stat. 3009. IIRIRA repealed section 212(c) and provided in its place a new equivalent form of relief from deportation called "Cancellation of Removal." IIRIRA § 304, 110 Stat. at 594–96 (codified at 8 U.S.C. § 1229b). Because IIRIRA generally does not apply to deportation proceedings initiated before April 1, 1997, this new provision has no application to Mr. Pottinger. *See* IIRIRA § 309(c), 110 Stat. 3009–625, *as amended by* Act of Oct. 11, 1997, Pub.L. 104–302, § 2, 110 Stat. 3656, 3657. His proceedings were commenced prior to that date, and the Immigration and Naturalization Ser-

vice (INS) is applying AEDPA rather than IIRIRA to his case.

### 1. Retroactivity of Section 440(d)

Following AEDPA's enactment on April 24, 1996, INS took the position that section 440(d) applied to all deportation proceedings pending on that date. The BIA rejected this interpretation, holding that section 440(d) could not retroactively be applied to bar individuals whose applications pre-dated AEDPA from receiving 212(c) relief. *See Matter of Soriano*, 1996 WL 426888 (beginning at screen page 1, BIA June 26, 1996). The Attorney General vacated the BIA's decision on September 12, 1996. A short opinion followed several months later setting forth her conclusion that section 440(d) should be applied to all pending 212(c) waiver cases, regardless of the application date. *See Matter of Soriano*, Int. Dec. 3289, 1996 WL 426888 (beginning at screen page 37, AG Op. Feb. 21, 1997).

In *Mojica*, 970 F.Supp. 130, Guillermo Mojica and Saul Navas—two long time permanent residents whose criminal conduct and convictions pre-dated AEDPA's enactment but whom the BIA had nonetheless held ineligible for 212(c) relief—filed petitions for writs of habeas corpus challenging the Attorney General's policy of retroactive application of section 440(d). *Mojica* concluded that the court had jurisdiction to review these claims under section 2241 of title 28, and held that application of section 440(d) to the petitioners (1) could raise due process problems since there was no independent rational basis for retroactivity, *see id.* at 170–71, (2) was contrary to Congress's designation of section 440(d) as prospective only, as implied by the contrast between that section's silence with regard to retroactivity and the explicit retroactivity language contained in numerous other provisions of the same title, *see id.* at 173, and (3) would operate drastically to alter the legal consequences of pre-enactment events, thus triggering the presumption against retroactivity and requiring section 440(d) to be read prospectively, *see id.* at 179–80. Accordingly, the petitions were granted, the orders of deportation vacated, and the INS ordered to adjudicate petitioners' 212(c) applications.

The court of appeals for the Second Circuit affirmed the grant of Mr. Navas' petition, "reject[ing] the Attorney General's position and hold[ing] that § 440(d) does not apply to cases initiated before the date of its enactment." *Henderson*, 157 F.3d at 129. The court noted that "[s]ince it is possible to decide this case on the ground that § 440(d) was not intended to apply to cases pending when the section was enacted, we need not reach [the] broader argument that the statute should not apply to primary conduct—*i.e.*, criminal convictions—that occurred prior to April 24, 1996." *Id.* at 128 n. 28. The court retained jurisdiction over Mr. Mojica's case pending resolution of a jurisdictional question it certified to the New York Court of Appeals. *See* Part IV.B, *supra.*

### 2. Substantive Issues Left Open in *Henderson* and *Mojica*

Both Mr. Maria's and Mr. Pottinger's cases present the broader issue not reached by the *Henderson* court, since, as already indicated, both petitioners were placed into deportation proceedings after AEDPA's enactment. Mr. Maria's case raises another issue left open by *Mojica*. Like Mr. Mojica and Mr. Navas, Mr. Pottinger committed his crime before AEDPA was signed into law. Unlike those petitioners, however, he pled guilty after the statute's enactment, giving rise to the question whether the operative event should be deemed to have preceded or post-dated AEDPA's adoption. Neither of these distinguishing factors warrants retroactive application of AEDPA's denial of section 212(c) relief. A parallel opinion, as noted, deals with the specific issues raised by Mr. Maria's petition.

The operative event in *Pottinger* and *Maria*, as well as in *Mojica* and *Henderson*, was the commission of the crime—the last wrongful act of the petitioner. In each of these cases, that event

occurred prior to AEDPA's enactment. The time of the conviction and the time deportation proceedings were commenced were happenstance.

### B. Mr. Pottinger's Situation

Mr. Pottinger is a twenty-year old native and citizen of Great Britain. He was admitted to the United States on April 9, 1981 at the age of three. With the exception of a trip to England for a funeral that same year, he has lived in the United States continuously since his admission.

His entire family, including his maternal grandparents, his mother and brother and his extended family of numerous aunts, uncles, and cousins, resides in the United States. At the time of his arrest, he lived in Jamaica, New York; he now lives in Hempstead, N.Y. Both are in the Eastern District of New York.

On December 18, 1995, Mr. Pottinger pled guilty to an attempted criminal sale of a controlled substance in the third degree. *See* N.Y. Penal Law §§ 110 and 220.39 (covering attempted sale of any weight of "narcotic drug" no matter how minute). On March 1, 1996, he was sentenced to six months in jail. He was released less than four and a half months later, on July 12, 1996. It is assumed that Mr. Pottinger committed the act to which he pled guilty, even though it is common knowledge that the draconian Rockefeller drug laws of New York place enormous pressures on a defendant—whether guilty or not—to plead guilty to a lesser crime in order to avoid a long prison term.

At the time of Mr. Pottinger's criminal act and of his guilty plea, he was eligible for relief under section 212(c) of the INA because the restrictive provisions of AEDPA had not yet been adopted.

On April 24, 1996, as noted, AEDPA was signed into law, barring 212(c) relief for aliens "deportable by reason of having committed any criminal offense covered in section 241(a)(2)(A)(iii) or (B) ..." AEDPA § 440(d)(2), 110 Stat. at 1277. The crime to which Mr. Pottinger had earlier pled guilty was included among the covered crimes.

On June 14, 1996, INS issued an Order to Show Cause charging Mr. Pottinger with deportability under INA section 241(a)(2)(B)(I) because of his conviction of a controlled substance violation, and INA section 241(a)(2)(A)(iii) for conviction of an aggravated felony. On June 27, *Soriano* was decided, holding that a section 212(c) humanitarian hearing was unavailable to people in Mr. Pottinger's position.

When, on July 12, 1996, Mr. Pottinger was released by the state, he was immediately taken into custody by INS He was held for three weeks without bond in Manhattan at INS's Varick Street facility before being transferred to its Oakdale, Louisiana installation on August 2, 1996.

On August 5, 1996, Mr. Pottinger appeared pro se at a bond redetermination hearing. The immigration judge denied him bond, explaining in a later written decision that bond was precluded by AEDPA section 440(c), which amended the INA to prohibit release on bond of aliens convicted of an aggravated felony.

Three weeks later, on August 23, 1996, Mr. Pottinger again appeared before an immigration judge. Now represented by counsel, he admitted deportability and requested a waiver of deportation under section 212(c). The immigration judge found him ineligible for 212(c) relief because he had not sought it prior to the date of AEDPA's enactment. He ordered Mr. Pottinger deported to the United Kingdom. On September 3, 1996, Mr. Pottinger appealed this decision to the BIA.

IIRIRA was signed into law on September 30, 1996. The statute's interim rules provided for the release of aliens such as Mr. Pottinger, who were being held without bond under AEDPA section 440(c). Accordingly, Mr. Pottinger requested a second bond redetermination hearing. At the hearing, on Dec. 23, 1996, bond was set at $12,000. Mr. Pottinger was released on

January 22, 1997 and returned home to Hempstead, New York.

In February, 1997, the Attorney General issued her opinion explaining the September 12th vacatur of the BIA's *Soriano* decision. It stated, as already explained, her summary and unsupported conclusion that section 440(d) applied to all proceedings pending at the time of AEDPA's enactment. This harsh decision of the Attorney General has repeatedly been rejected by the courts. *See, e.g., Henderson,* 157 F.3d at 128–30; *Mojica,* 970 F.Supp. at 168–82; *Goncalves v. Reno,* 144 F.3d 110, 126–33 (1st Cir.1998); *Mayers v. INS,* 175 F.3d 1289, 1301–04 (11th Cir.1999); *Sandoval v. Reno,* 166 F.3d 225, 239–42 (3d Cir.1999).

On April 15, 1997, the BIA, having determined—as ordered by the Attorney General—that section 440(d)'s bar to relief applied to Mr. Pottinger, dismissed his appeal. On April 24, 1997, it issued a "Notice to Deliver Alien" directing Mr. Pottinger to surrender for deportation. Mr. Pottinger surrendered to the INS facility in Oakdale, Louisiana on May 27, 1997, three days before this court decided *Mojica.*

With the exception of the fact that Mr. Pottinger's deportation proceedings were commenced post-AEDPA, his circumstances are, for legal purposes, factually identical to those of Mr. Mojica. Both were convicted of deportable offenses prior to AEDPA's enactment. Both were initially taken into custody in New York and held at the Varrick Street facility. They were then transferred to Oakdale without having seen an immigration judge and ordered deported. Released on bond, both returned to their homes in the Eastern District of New York, where they received surrender orders from the New Orleans District Director. Both traveled under compulsion of the New Orleans District

Director's surrender order from New York to Oakdale.

## III. HISTORICAL, CONSTITUTIONAL AND INTERNATIONAL LAW BACKGROUND

The historical, constitutional and international law principles which require the courts to assume that Congress acted rationally and by design in forbearing from the retroactive punishment of people like petitioners Mojica, Navas, Henderson, Maria and Pottinger have been treated in the *Mojica* memorandum. *See Mojica,* 970 F.Supp. at 142–52, 169–71. *See also Maria,* No. 98 CV 3287 (E.D.N.Y. Aug. 27, 1999).

## IV. JURISDICTION TO ISSUE A WRIT OF HABEAS CORPUS

### A. Subject Matter

■ All requirements for this court to exercise subject matter jurisdiction are met. District courts have habeas corpus jurisdiction pursuant to 28 U.S.C. § 2241. *See Henderson,* 157 F.3d at 122; *Jean-Baptiste v. Reno,* 144 F.3d 212, 220 (2d Cir.1998), *reh'g denied,* 175 F.3d 226 (2d Cir.1999). All of petitioners' claims, constitutional and statutory, are included within the scope of that jurisdiction. *Henderson,* 157 F.3d at 122 (habeas jurisdiction exists over statutory claims "affecting the substantial rights of aliens … in the face of statutes seeking to limit judicial jurisdiction to the fullest extent constitutionally possible"). Since Mr. Pottinger is in physical custody in Louisiana, Section 2241's "in custody" requirement is met.

### B. Personal Jurisdiction and Venue

■ The appropriate forum in a habeas corpus proceeding depends upon (1) the court's personal jurisdiction over the custodian and (2) traditional venue considerations. *See Mojica,* 970 F.Supp. at 165. There is no dispute that venue is proper in the Eastern District of New York.

The government contends, however, that the court lacks personal jurisdiction over either the INS New Orleans District Director or the Attorney General, both of

whom Mr. Pottinger has designated as respondents.

In *Henderson,* the Second Circuit certified to the New York Court of Appeals the question of whether the Louisiana District Director, Mr. Caplinger, had sufficient contacts with New York to satisfy the New York long arm statute. *See Henderson,* 157 F.3d at 124. It declined to reach the question of whether the Attorney General was a proper respondent since it was possible that the New York Court of Appeals would decide there was jurisdiction over Mr. Caplinger. *See id.* at 128.

The New York Court of Appeals decided not to answer the certified question. *See Yesil v. Reno,* 92 N.Y.2d 455, 682 N.Y.S.2d 663, 705 N.E.2d 655 (N.Y.1998). It stated:

> Without implying any view on the availability of CPLR 302(a)(1) as the proffered jurisdictional predicate with respect to the individuals and circumstances involved in this case, we note our uncertainty whether the certified questions can be determinative of the underlying matters. Alternative possibilities for obtaining jurisdiction, flowing from other potential Federal and State sources, seem far reaching.

*Id.* Meanwhile, the Supreme Court denied the government's petition for certiorari in *Henderson. See Navas v. Reno,* — U.S. —, 119 S.Ct. 1141, 143 L.Ed.2d 209 (1999) (denying certiorari in companion cases of *Navas v. Reno* and *Yesil v. Reno* ). The Second Circuit then requested additional briefs from the parties on the point of personal jurisdiction. Prior to submitting briefs to the court of appeals, the parties settled. The Second Circuit then granted their joint motion to withdraw the appeal with prejudice, leaving unresolved the personal jurisdiction issue. *Yesil v. Reno,* 175 F.3d 287 (2d Cir.1999).

 Until the court of appeals directs otherwise, the law to be applied by this court in similar cases will be that explicated in *Mojica v. Reno,* 970 F.Supp. at 165–67, providing for personal jurisdiction over both District Director Caplinger and the Attorney General. In the present proceedings the respondents' jurisdictional objections are rejected for the reasons stated in *Mojica. See id.*

The government nonetheless continues to argue that "the only transaction from which Mr. Pottinger's habeas petition arose was the Louisiana-based District Directors's sending of a single surrender notice to Mr. Pottinger in New York ..." Memorandum of Law in Opposition to Petition for Writ of Habeas Corpus at 10. Even were that true, it somewhat denigrates the power and effective reach of the New Orleans District Director. For his notice was backed by all the power of the federal government and all of its branches operating in New York and directed by the Attorney General from Washington, D.C. In effect, the notice told petitioner, "I, the District Director in Louisiana, am present in New York with all the federal forces at my disposal to take you into custody wherever I find you in New York and to carry you off to Louisiana or any other place INS operates unless you surrender." The District Director was not operating a local candy store in Louisiana; he was an official and officer of the United States, part of the most powerful nation in the world, reaching into New York to pluck out of it an alien, the petitioner.

## V. PRESUMPTION AGAINST RETROACTIVE APPLICATION

 In the landmark case of *Landgraf v. USI Film Products,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), the Supreme Court set forth the principles governing the determination of a statute's temporal reach. The threshold question is whether Congress has expressed its intent with regard to the statute's time frame.

> If Congress has done so ... there is no need to resort to judicial default rules. When, however, the statute contains no such express command, the court must determine whether the new statute would have retroactive effect, i.e.,

whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.

*Id.* at 280, 114 S.Ct. 1483.

In *Lindh v. Murphy,* which concerned the retroactive effect of AEDPA's provision heightening the standards for the availability of habeas relief in noncapital cases, the Supreme Court elaborated further on the initial step of the *Landgraf* analysis. Finding that silence as to temporal reach in one provision of the statute implied prospectivity where Congress had expressly provided for retroactivity to pending cases in another provision, the *Lindh* Court established negative implication as one of the "normal rules of statutory construction" to be used by the courts in determining a statute's temporal reach. *Lindh,* 521 U.S. 320, 326, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). *See also Mayers,* 175 F.3d at 1302 ("*Lindh* expands the tools available to courts to determine congressional intent"); *Sandoval,* 166 F.3d at 240 ("the *Lindh* Court made clear that the rule of negative implication is part of the normal rules of statutory construction"); *cf. Mathews v. Kidder Peabody & Co.,* 161 F.3d 156 (3d Cir.1998) (describing *Lindh* as having added a "new step" to the *Landgraf* analysis).

### A. *Chevron*

Judicial review of an agency's construction of a statute entrusted to its administration ordinarily entails a two-step inquiry:

First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is an end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the Court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

■■ This framework, while appropriate for reviewing agencies' resolutions of policy questions delegated to their rulemaking power and necessitating reliance on their expertise, is unwarranted where questions of pure statutory construction are concerned. The retroactive effect of a statute fits into the latter category. As the court of appeals for the First Circuit has noted, "[t]he question of whether AEDPA § 440(d) applies retroactively may be viewed as a pure question of statutory construction for the courts to decide." *Goncalves,* 144 F.3d at 127 (citation and internal quotation marks omitted). Other circuits have concurred. *See, e.g., Mayers,* 175 F.3d at 1301–02 ("It is far from clear . . . that deference is appropriate in these circumstances. The question of a statute's effective date is generally considered to be a pure question of law for courts to decide." (citations omitted)); *Sandoval,* 166 F.3d at 239 ("an issue concerning a statute's effective date is not one that implicates agency expertise in a meaningful way, and does not, therefore, appear to require *Chevron* deference" (citation omitted)); *cf. Mojica,* 970 F.Supp. at 181 (deference is "wholly inappropriate" where the Attorney General's conclusion that AEDPA section 440(d) applied to pending cases was "not based on statutory construction but rather on her interpretation of judicial

default rules enunciated by the Supreme Court").

Ultimately, whether the particular retroactivity issue raised by the instant case is deemed a matter of pure statutory construction on which the judiciary should have the last word, *see I.N.S. v. Cardoza–Fonseca*, 480 U.S. 421, 446, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987), or one entitled to *Chevron* deference, need not be decided. The analysis of Congressional intent under the first step of *Chevron* requires the use of "traditional tools of statutory construction." *Chevron*, 467 U.S. at 843 n. 9, 104 S.Ct. 2778. The *Landgraf* presumption against retroactivity is one such tool. *See, e.g., Henderson*, 157 F.3d at 129 (citing the "strong presumption against retroactivity" as relevant to the first step of a *Chevron* inquiry); *Sandoval*, 166 F.3d at 240 (applying presumption against retroactivity as one of "traditional tools of statutory construction" *Chevron* directs courts to apply in ascertaining Congress' intent); *Mayers*, 175 F.3d at 1302 (same); *Goncalves*, 144 F.3d at 127 (same). Absent clear evidence of congressional design to the contrary, precluded is the retroactive application of a statute where retroactivity would "attach[ ] new legal consequences to events completed before its enactment." *Landgraf*, 511 U.S. at 270, 114 S.Ct. 1483.

**B. AEDPA 440(d)**

A comparison of Congress's varying approaches to retroactivity in different provisions of AEDPA Title IV has lead every court of appeals presented with the issue of section 440(d)'s temporal reach to conclude, by negative implication, that the section was not intended to apply to administrative deportation proceedings pending at the time of AEDPA's enactment. *See Henderson*, 157 F.3d at 130; *Goncalves*, 144 F.3d at 133; *Mayers*, 175 F.3d at 1304; *Sandoval*, 166 F.3d at 242. *But cf. LaGuerre v. Reno*, 164 F.3d 1035, 1040–41 (7th Cir.1998) (rejecting arguments against retroactivity in dicta). While none of these courts went beyond the issue of section 440(d)'s applicability to pending deportation proceedings, their analytic approach supports the more expansive conclusion that Congress did not design section 440(d) to apply to cases in which deportation was triggered by pre-enactment conduct. *Cf. Mojica* 970 F.Supp. at 172–73 (deriving from same analytic method conclusion that section 440(d) does not apply to convictions predating AEDPA's enactment); *Wallace v. Reno*, 24 F.Supp.2d 104, 110–112 (D.Mass. 1998) (same).

In *Mojica*, 970 F.Supp. at 172–73, six sections of AEDPA Title IV providing for differing degrees of retroactivity, supported the conclusion that "where Congress chose to deviate from the principle of prospectivity," it was capable of doing so with great specificity. *Id.* at 173. As the Supreme Court pointed out in *Lindh*, in drafting AEDPA Congress may well have been laboring under a heightened awareness of the need to be explicit with respect to retroactivity in view of the recency of the *Landgraf* decision. *See Lindh*, 521 U.S. at 328, 117 S.Ct. 2059.

AEDPA section 440(d)'s silence as to temporal reach stands in stark contrast to the finely calibrated retroactivity language of other Title IV provisions—sections 401(f), 421(b), 413(g), 435(b), 440(f) 441(b). The text of these provisions is set forth in *Mojica*, but a brief review—in order of most to least retroactive—is useful.

Section 401(f) provides that the amendments made by section 401—the general provision for "alien terrorist removal"—"shall apply to all aliens without regard to the date of entry or attempted entry into the United States." AEDPA § 401(f), 110 Stat. at 1268. Section 401 thus applies to all terrorist conduct no matter when it occurred with no restrictions. As suggested by the recent legislation in this field, it was the danger of terrorists that was Congress's primary concern. The "garden variety" crimes of which petitioner was guilty were already severely punishable under state and federal statutes and required no

additional retroactive penalty of exclusion or deportation from the country.

Section 413 eliminates eligibility for withholding of deportation, suspension of deportation, and adjustment of status for persons deportable under section 241(a)(4)(B) of the INA, i.e., alien terrorists. AEDPA § 413(a),(b),(d), 110 Stat. at 1269. Section 413(g) provides that these amendments "shall apply to applications filed before, on or after such date if final action has not been taken on them before such date." *Id.* Thus, section 413(g) reaches pre-enactment conduct in all cases in which there has been no decision on an application for relief.

Section 421(a) bars asylum for persons excludable or deportable by reason of their participation in terrorist activity. AEDPA § 421(a), 110 Stat. at 1270. Section 421(b) states that the amendments "shall apply to asylum determinations made on or after such date." *Id.* This section's applicability to pre-enactment conduct is only restricted by a pre–AEDPA final decision by the INS granting or denying asylum.

Section 441 bars collateral challenges to deportation orders, AEDPA § 441(a), 110 Stat. at 1279, and limits applicability of the bar to cases in which criminal proceedings are initiated after AEDPA's enactment. AEDPA § 441(b), 110 Stat. at 1279. This section's applicability to pre–enactment conduct appears to depend on the post–AEDPA initiation of criminal prosecution.

Section 435(a) expands the criteria of deportation for crimes of moral turpitude. AEDPA § 435(a), 110 Stat. at 1274. AEDPA section 435(b) makes the amendments applicable to "aliens against whom deportation proceedings are initiated after the date of the enactment of this Act." AEDPA § 435(b), 110 Stat. at 1274–75. This section makes deportable pre-AEDPA activity which did not previously trigger deportability. It might be interpreted to reach pre-enactment conduct in all cases where deportation proceedings were commenced after AEDPA's enactment.

Sections 440(e) and 440(f) respectively, amend the INA's "aggravated felony" definition and provide that the amendments "shall apply to convictions entered on or after the date of enactment" (with the exception of the amendment to the "alien smuggling" provision, which was given an earlier effective date). §§ 440(e) & (f), 110 Stat. at 1277–1278. These sections are arguably the least retroactive of the six, as reaching pre-enactment conduct only in those cases in which criminal conviction post-dates AEDPA.

Analysis of these provisions supports a number of conclusions. First, although they create a continuum of degrees of retroactivity, Congress drew a clear line of demarcation between alien terrorists and criminal aliens with regard to the retroactivity of the provisions affecting each group. All three provisions relating to alien terrorists arguably are virtually fully retroactive barring final action on an application for relief. The other provisions are markedly less retroactive.

Of particular significance are the two alien terrorist provisions which, like section 440(d), restrict the availability of relief from deportation. The full and explicit retroactivity of these provisions (absent a final decision as to relief) contrasts sharply with section 440(d)'s silence and demonstrates Congress's focus on the nature of the conduct triggering deportability.

Given the scalpel-like precision with which Congress provided for degrees of retroactivity in different provisions of Title IV, there is no reason to interpret section 440(d)'s silence as an indication of congressional design to exclude the section's retroactivity only where deportation proceedings were pending at the time of AEDPA's enactment. Congress knew how to draft precisely such a retroactivity provision. It did so in section 435(b). Congress's choice not to include such language—or any retroactivity language—in section 440(d) is reasonably construed as evidence of its

plan to designate the section as applicable only to post-enactment conduct.

The legislative history relied upon in *Henderson*—specifically, the elimination of retroactivity language from the Senate version of what later became AEDPA section 440(d)—also supports the broader conclusion Mr. Pottinger now seeks. *See Henderson*, 157 F.3d at 130.

Interpreting section 440(d) as retroactively applicable except where deportation proceedings were initiated prior to AEDPA's enactment would be arbitrary. It would not make sense to imply from Congress's silence its intention to except from the retroactive reach of section 440(d) only those petitioners fortunate enough to have had their proceedings commenced prior to April 24, 1996 (a matter largely within INS control). Even if silence did not in this instance eloquently proclaim Congress's prospective design, however, the strong presumption against retroactivity would still preclude section 440(d)'s application to those cases in which deportability is triggered by pre-enactment conduct.

The ancient pre-constitutional origins and continued vitality of the anti-retroactivity principle were reaffirmed in *Landgraf*:

> The presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic. Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not lightly be disrupted. For that reason, the principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal appeal.

*Landgraf*, 511 U.S. at 265, 114 S.Ct. 1483 (citations and internal quotation marks omitted); *see also Lynce v. Mathis*, 519 U.S. 433, 439, 117 S.Ct. 891, 137 L.Ed.2d 63 (1997).

The presumption against retroactivity is an expression of our core values of fairness and justice. *See Landgraf*, 511 U.S. at 270, 114 S.Ct. 1483 ("The presumption against statutory retroactivity has consistently been explained by reference to the unfairness of imposing new burdens on persons after the fact.") *id.* at 272, 114 S.Ct. 1483 ("Requiring clear intent assures that Congress itself has affirmatively considered the potential unfairness of retroactive application and determined that it is an acceptable price to pay for the countervailing benefits."). It reflects our enduring commitment to the protection of the unpopular and the voiceless from the retributive and vindictive use of retroactive legislation. *Id.* at 267–68, 114 S.Ct. 1483; see also *Mojica*, 970 F.Supp. at 174. Absent a plain congressional statement of retroactive intent, the *Landgraf* presumption applies. The inquiry is fundamentally a functional one:

> The court must ask whether the new provision attaches new legal consequences to events completed before its enactment. The conclusion that a particular rule operates retroactively comes a the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event.

*Id.* at 269–70, 114 S.Ct. 1483. "[R]etroactivity is a matter on which judges tend to have sound instincts, and familiar notions of fair notice, reasonable reliance and settled expectations offer sound guidance." *Id.* at 270, 114 S.Ct. 1483. In the instant case, involving a radical change in the law eliminating a major opportunity to avoid deportation from the country of the petitioner's family and upbringing to one with which he has virtually no connection, "sound instincts" cry out against retroactivity. What is involved here is a fundamental aspect of life and liberty of the petitioner.

The Supreme Court has repeatedly recognized the relevance of ex post facto cases to the understanding of what it means for a law to have a retroactive effect. *See Landgraf,* 511 U.S. at 269 n. 3, 114 S.Ct. 1483 (citing *Miller v. Florida,* 482 U.S. 423, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987)); *Hughes Aircraft Co. v. U.S. ex rel. Schumer,* 520 U.S. 939, 948, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997) (citing *Collins v. Youngblood,* 497 U.S. 37, 49, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990) and *Beazell v. State of Ohio,* 269 U.S. 167, 169–70, 46 S.Ct. 68, 70 L.Ed. 216 (1925)). Ex post facto case law would seem to be particularly pertinent, where, as here, the statute at issue, though technically a civil one, imposes additional consequences in connection with past criminal conduct. These cases teach that a statute converting a possible consequence of past activity into a necessary one is retroactive. *See, e.g., Lewisburg Penitentiary v. Marrero,* 417 U.S. 653, 663, 94 S.Ct. 2532, 41 L.Ed.2d 383 (1974) (statute eliminating previously available parole eligibility "would clearly present the serious question under the *ex post facto* clause ... of whether it imposed a greater or more severe *punishment* than was prescribed by law at the time of the ... offense" (citation and internal quotation marks omitted) (emphasis in original)); *Lindsey v. State of Washington,* 301 U.S. 397, 401–02, 57 S.Ct. 797, 81 L.Ed. 1182 (1937) (statute enacted after crime's commission changing the maximum sentence then in effect to a mandatory one violated the ex post facto clause since "[i]t was plainly to the substantial disadvantage of petitioners to be deprived of all opportunity to receive a sentence which would give them their freedom from custody and control prior to the expiration of the fifteen-year term").

The presumption against retroactivity and the prohibitions of the Ex Post Facto Clause are merely facets of the broader Constitutional prohibition against retroactive legislation.

In both the civil and criminal context, the Constitution places limits on the sovereign's ability to use its law-making power to modify bargains it has made with its subjects. The basic principle is one that protects not only the rich and the powerful, but also the indigent defendant engaged in negotiations that may lead to an acknowledgment of guilt and suitable punishment.

*Lynce,* 519 U.S. at 440, 117 S.Ct. 891; *see also* The Federalist No. 44, at 282 (James Madison) (Clinton Rossiter ed., 1961) ("Bills of attainder, ex post facto laws, and laws impairing the obligations of contracts, are contrary to the first principles of the social compact and to every principle of sound legislation.").

Applying these principles to the instant case, the question is whether application of AEDPA section 440(d) to Mr. Pottinger would attach a "new legal consequence[ ] to events completed before [the statute's] enactment." *Landgraf,* 511 U.S. at 270, 114 S.Ct. 1483. In *Mojica,* while the relevant "event" was assumed to be, for purposes of discussion, the petitioners' guilty pleas, it was nonetheless recognized that "[r]etroactivity depends on when the crime is committed, and not on any later date." *Mojica,* 970 F.Supp. at 175. The operative act in the instant case is not Mr. Pottinger's guilty plea or the commencement of deportation proceedings against him, but his commission of the offense which rendered him deportable. The fact that the act in question was unlawful or repugnant from a moral standpoint does not affect the analysis. A "legal change that would have an impact on private parties' planning" triggers the presumption against retroactivity, even if the change is only the attachment of additional civil liability to conduct that was already deemed "morally reprehensible or illegal." *Landgraf,* 511 U.S. at 282–83 & n. 35, 114 S.Ct. 1483.

It should be noted that if the relevant act in Mr. Pottinger's case were deemed to be his "guilty plea" rather than his criminal conduct, the requirement of fair notice

in the context of plea negotiations—as developed extensively in *Mojica*—applies to him. *See Mojica,* 970 F.Supp. at 175–78. The only relevant difference between Mr. Pottinger and the two petitioners in *Mojica* is the fact that the I.N.S. did not commence deportation proceedings in Mr. Pottinger's case until after AEDPA was adopted.

At the time Mr. Pottinger committed his crime, it was a deportable offense. Nonetheless, he could depend on the availability of a 212(c) hearing. The genuine retroactive effect of the elimination of this crucial avenue of relief is apparent. *Goncalves v. Reno,* 144 F.3d at 128 (retroactive application of AEDPA section 440(d), "takes away a form of relief that, while discretionary, is plainly substantive, and so implicates *Landgraf's* presumption against retroactivity"); *Henderson,* 157 F.3d at 129 (2d Cir. 1998) (court noted in dictum its inclination to find section 440(d) genuinely retroactive).

The presumption that such a dire consequence may not retroactively be imposed is an example of our society's assumption that a person should not be punished for an act which was not criminal when committed, or, if it was criminal, that the penalty should be no greater than that in effect at the time of the act's commission. It is a sign of the maturity and restraint of our society that it insists on controlling its impulse to punish more harshly based on afterthought or political whim. Retroactivity under such circumstances demeans the nation and is prohibited by the principles underlying ex post facto rules and their civil analogues. *Cf. Miller v. Florida,* 482 U.S. 423, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987) (application of Florida's revised sentencing guidelines to petitioner, whose crimes were committed before the revision's effective date violated ex post facto clause); *United States v. Patasnik,* 89 F.3d 63, 72 (2d Cir.1996) (district court's use of amended Guidelines manual to depart upward where defendant would not have been subject to such an enhance-

ment under the manual in effect at the time he committed his offense violated the ex post facto clause).

The law assumes that one who commits a crime acts in reliance on the existing legal framework, even if this reliance is not based on actual, literal knowledge of the content of the laws—such as that permitting a 212(c) hearing. A lawful permanent resident is, in any event, part of a community and it is not unreasonable to attribute to him or her a basic sense of what happens to other members of the resident alien community who engage in criminal conduct. At the time Mr. Pottinger committed his offense, long-term permanent residents with strong family ties and other positive connections to the United States stood a good chance of being granted relief from deportation. The law in its lenity assumes that Mr. Pottinger measured the consequences of his acts against this backdrop.

C. Rule of Lenity

*I.N.S. v. Cardoza–Fonseca* directs courts to "constru[e] any lingering ambiguities in deportation statutes in favor of the alien." 480 U.S. 421, 449, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). This rule may be characterized as an example of *Landgraf's* injunction to read statutes, where possible, as protecting disfavored groups. See *Mojica,* 970 F.Supp. at 180. ("[T]he Landgraf Court directed courts interpreting statutes to pay special attention to 'unpopular groups or individuals.' This rule of resolving ambiguities in favor of aliens is one specific example of general *Landgraf* principles."). Here, the rule of lenity complements *Landgraf* in requiring the statute to be read in favor of the petitioner.

D. Constitutional Issues

The adverse constitutional results that Congress can be assumed to have intended to avoid have been treated in *Mojica. Id.* at 169–72; *see also Maria* (forthcoming). They need not be rehearsed again here. They favor a finding that denial of a sec-

tion 212(c) humanitarian hearing was not part of congressional design where deportation is triggered by crime committed prior to the effective date of a statute eliminating the right to such a hearing.

## VI. CONCLUSION

Petitioner, Mr. Pottinger, is entitled to a section 212(c) hearing or its functional equivalent. The writ of habeas corpus is granted only to this extent. The parties shall agree upon and submit a judgment within ten days or submit individual proposed judgments within ten days.

So ordered.