**Vincent FULLER, Petitioner,**

v.

**IMMIGRATION & NATURALIZATION SERVICE, Respondent.**

**No. 3:99CV00454 (JBA).**

United States District Court,
D. Connecticut.

Nov. 15, 2000.

Michael G. Moore, Law Offices of Maria De Castro Foden, Hartford, CT, for petitioner.

James K. Filan, Jr., U.S. Attorney's Office, New Haven, CT, for respondent.

## SUBSTITUTED MEMORANDUM AND RULING ON MOTION TO DISMISS

ARTERTON, District Judge.

Petitioner Vincent Fuller brought this petition for a writ of habeas corpus, stay of deportation and remand to the Immigration Judge ("IJ") for further proceedings. Respondent, the Immigration and Naturalization Service ("INS") now moves to dismiss Mr. Fuller's petition for lack of subject matter jurisdiction.

## I. FACTUAL BACKGROUND

Mr. Fuller was a lawful permanent resident who had resided in the United States since he came to the country in 1977 at the age of 5. On May 13, 1992, he was convicted in Connecticut state court of the sale of a controlled substance. On December 24, 1996, the INS issued an Order to Show Cause why Fuller should not be deported pursuant to 8 U.S.C. § 1251(a)(2)(A)(iii) (1994) (recodified as 8 U.S.C. § 1227(a)(2)(A)(iii) (1996)). After a hearing on July 23, 1997, the IJ ordered Fuller deported to Jamaica. The decision (which is a fill-in-the-blank form), specifically finds that Fuller is not eligible for discretionary relief under Section 212(c) (8 U.S.C. § 1182(c)), by reason of his conviction for a criminal offense covered by Section 241(a)(2)(A)(iii), (B), (C), or (D). The decision further notes that an appeal was reserved by the then-respondent (Fuller), and that such appeal was due August 22, 1997. Apparently, no appeal was ever taken.

Fuller (represented by counsel at this point) then moved to reopen the Immigration Law Judge's decision. The motion to reopen was denied on February 2, 1999 (also by fill-in-the-blank decision). Specifically, the judge denied the motion to reopen for the reason "that the *Henderson* case has been stayed pursuant to a Petition for Certiorari filed on 1–19–99 (No. 98–1160) and no showing of timeliness to reopening."

On March 12, 1999, Fuller filed a "Petition for Habeas Corpus, Stay of Deportation and Remand" in this Court, which was not served on the INS but which was received by the United States Attorney via certified mail on March 16, 1999. Despite its caption, this pleading was erroneously docketed only as a petition for habeas corpus, and as such was not treated with any urgency by the clerk's office, nor did the clerk's office alert this Court that the stay request might require immediate attention. In fact, although the petition for stay is stamped by the clerk's office as filed on March 12, 1999, the docket sheet indicates that it was only docketed and entered into the computer system on March 17, five calendar days later. On March 18, 1999, six days after the filing of his petition to stay and before this Court was ever aware of the pendency of that petition, Fuller was deported from the United States, without notice to Fuller's attorney, the U.S. Attorney or this Court. According to affidavits of the INS officers who accompanied Mr. Fuller to the airport, he informed them that his attorney had filed an appeal of his case, and asked that he not be deported. The agents then called an unidentified person in the Hartford INS office and were allegedly in-

formed "that there was no paperwork indicating any appeals or stays had been filed on behalf of Mr. Fuller." Peloquin Aff. at ¶ 7. Fuller was therefore put on a plane for Jamaica. On March 22, 1999, Fuller's attorney, having now found out that his client had been deported, filed an "Emergency Motion for Hearing." The INS subsequently moved to dismiss the petition, arguing that Fuller had failed to exhaust his administrative remedies and that his deportation deprived this Court of jurisdiction to decide the petition.

At oral argument on the government's motion to dismiss, the Assistant United States Attorney stated that "what our standard practice now is is when I get a petition in I ... call the INS, I find out the status of the petitioner and if there is any effort to move [him] I call the court and say they want to move him, I want to give the court a chance to step in." Transcript of July 19, 1999 Oral Argument. As to why this procedure was not followed in Mr. Fuller's case, the Assistant explained that "[the U.S. Attorney's office] didn't know ahead of time. He was deported before I got—before I saw—physically saw the petition. So, that I mean that—it's unfortunate, but that's the way it is." *Id.* Presumably, the INS is aware of the U.S. Attorney's office practice. Clearly, no one from the INS checked with the U.S. Attorney's office in response to Mr. Fuller's plea not to be deported in light of pending legal proceedings.

In the Court's view, Mr. Fuller's deportation when he had a petition to stay pending and so advised the INS is more than "unfortunate." The fact that the motion to stay never found its way to the proper mailbox at the U.S. Attorney's office so

that the office could implement its practice of contacting the INS to check the deportation status and informing the Court of the INS' intentions, the failure of the INS to take appropriate steps to accurately verify the accuracy of petitioner's claim of pending proceedings before putting him on the plane, the failure of petitioner's counsel to also serve the INS and to alert the Court of the pendency of the motion to stay, and the foremost failure of the clerk's office's to promptly and correctly docket the case resulting in the petition not being timely brought to the Court's attention, all have resulted in Mr. Fuller's involuntary return to a country where he has not lived since he was five, and where he claims to have no family or connections. The conjunction of these failures, for which excepting his counsel's Mr. Fuller bears no responsibility, is now claimed in Respondent's Motion to Dismiss to have ousted this Court of its continuing jurisdiction, notwithstanding the anticipation that the Court would have ordered the deportation at least temporarily stayed to permit an initial review of petitioner's grounds, given that the issue presented was an open question at the time.[1]

Based on these hopefully anomalous circumstances, and as discussed below, the Court concludes that Mr. Fuller's deportation does not divest this Court of jurisdiction. The clerk's office treated Mr. Fuller's petition in an inexcusably dilatory manner, particularly in light of the well-known dispatch with which deportations occur, and whether attributable to negligence or the exigencies of the timetable at issue, both petitioner's counsel and the U.S. Attorney's office failed to advise the

---

1. In fact, since the original March 31, 2000 ruling issued in this case, the Second Circuit has concluded that, in a case brought under the permanent rules, the bar to Section 212(c) relief from removal was not properly applied retroactively to pre-enactment guilty pleas. *See St. Cyr v. INS*, 229 F.3d 406 (2d Cir.2000).

Court that immediate action was necessary.

Further, Mr. Fuller's failure to exhaust his administrative remedies on the claims he presents in his petition is excused, due to the futility of requiring an appeal to the Bureau of Immigration Appeals when the Attorney General had already issued a definitive ruling on the subject that would have controlled the disposition of Mr. Fuller's appeal. Based on the reasoning that follows, the Court therefore DENIES defendant's motion to dismiss the petition based on lack of subject matter jurisdiction.

## II. DISCUSSION

### A. Changes in the Immigration Laws

Complicating the resolution of this case is the fact that the Immigration and Naturalization Act ("INA"), 8 U.S.C. § 1221 *et seq.*, has been amended twice since 1996. Under the law extant prior to these amendments, "an order of deportation shall not be reviewed by any court if the alien... has departed from the United States after the issuance of the [deportation] order." 8 U.S .C. § 1105a(c) (referred to as Section 106(c) of the INA). Section 106(a)(1) of the INA allowed for a petition for review of a deportation decision to be filed with the Court of Appeals, while Section 106(a)(3) provided for an automatic stay of deportation orders when such a petition for stay was served on the U.S. Attorney and the INS official in charge of the Service District. Thus, before the 1996 amendments, under Section 106 of the INA (8 U.S.C. § 1105a) review of deportation orders was primarily by way of the courts of appeals, without initial recourse to the district courts. The INA did provide for habeas corpus review by the district court in Section 106(a), 8 U.S.C. § 1105a(a)(10). Simultaneously, the district court also had jurisdiction to entertain habeas corpus proceedings pursuant to 28 U.S.C. § 2241. *See* Lennie B. Benson, *Back to the Future: Congress Attacks the Right to Judicial Review of Immigration Proceedings,* 29 Conn. L.Rev. 1411, 1431 (1997).

On April 24, 1996, the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214 *et seq.* (1996), went into effect, amending and repealing numerous sections of the INA. Among the jurisdictional casualties of this act was Section 1105a(a)(1). In its stead, AEDPA provided that "any final order of deportation against an alien who is deportable by reason of having committed a criminal offense [covered in the deportation provisions of the INA] shall not be subject to review by any court." AEDPA § 440(a), 8 U.S.C. § 1105a(a)(10) (1996).

On the heels of AEDPA, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), Pub.L. No. 104–208, 110 Stat. 3009–546 *et seq.* (1996), which took effect on September 30, 1996. The IIRIRA contains two sets of provisions, one transitional and the other permanent. The transitional provisions—which are not codified in the U.S.Code—control deportation proceedings started prior to April 1, 1997, in which the deportation order became administratively final after October 30, 1996—in other words, Mr. Fuller's case. *See Henderson v. INS,* 157 F.3d 106, 117 (2d Cir.1998), *cert. denied* 119 S.Ct. 1141, 119 S.Ct. 1141, 143 L.Ed.2d 209 (1999).

The transitional rules provide that "[s]ubject to the succeeding provisions of this subsection, in the case of an alien who is in exclusion or deportation proceedings as of the title III–A effective date (October 30, 1996)—

(A) the amendments made by this subtitle shall not apply, and

(B) the proceedings (including judicial review thereof) shall continue to be conducted without regard to such amendments."

Two of the succeeding subsections in IIRIRA § 309(c)(4), however, do make substantive changes to the law governing removal proceedings and are relevant to Mr. Fuller's predicament. Specifically:

(F) service of the petition for review shall not stay the deportation of an alien pending the court's decision on the petition, unless the court orders otherwise; and

(G) there shall be no appeal permitted in the case of an alien who is inadmissible or deportable by reason of having committed a criminal offense covered in section 212(a)(2) or section 241(a)(2)(A)(iii), (B), (C), or (D) of the Immigration and Nationality Act (as in effect as of the date of the enactment of this Act), or any offense covered by section 241(a)(2)(A)(ii) of such Act (as in effect on such date) for which both predicate offenses are, without regard to their date of commission, otherwise covered by section 241(a)(2)(A)(I) of such Act (as so in effect).[2]

The government reads the general statement of non-retroactivity in IIRIRA § 309(c) to mean that the prohibition on reviewing an order of deportation after an alien's departure contained in the old § 1105a(c) still applies under the transitional regime applicable to Mr. Fuller. When combined with the effect of the other specific transitional provisions governing his case, under the Government's interpretation of applicable law, Mr. Fuller is left with no automatic stay upon filing of a petition for review pursuant to § 309(c)(4)(F), no judicial review of the INS' determination that Mr. Fuller is deportable due to his convictions for certain criminal offenses, and no review of his

2. Section 309(C)(4) provides in full:

Transitional Changes in Judicial Review— In the case described in paragraph (a) in which a final order of exclusion or deportation is entered more than 30 days after the date of the enactment of this Act, notwithstanding any provision of section 106 of the Immigration and nationality Act (as in effect as of the date of the enactment of this Act) to the contrary—

(A) in the case of judicial review of a final order of exclusion, subsection (b) [8 U.S.C. § 1105a(b)] of such section shall not apply and the action for judicial review shall be governed by the provisions of subsections (a) and (c) [8 U.S.C. §§ 1105a(a) and (c)] of such in the same manner as they apply to judicial review of orders of deportation;

(B) a court may not order the taking of additional evidence under section 2347(c) of title 28, United States Code;

(C) the petition for judicial review must be filed not later than 30 days after the date of the final order of exclusion or deportation;

(D) the petition for review shall be filed with the court of appeals for the judicial circuit in which the administrative proceedings before the special inquiry officer or immigration judge were completed;

(E) there shall be no appeal of any discretionary decision under 212(c), 212(h), 212(I), 244, or 245 of the Immigration and Nationality Act (as in effect as of the date of the enactment of this Act);

(F) service of the petition for review shall not stay the deportation of an alien pending the court's decision on the petition, unless the court orders otherwise; and

(G) there shall be no appeal permitted in the case of an alien who is inadmissible or deportable by reason of having committed a criminal offense covered in section 212(a)(2) or section 241(a)(2)(A)(iii), (B), (C), or (D) of the Immigration and Nationality Act (as in effect as of the date of the enactment of this Act), or any offense covered by section 241(a)(2)(A)(ii) of such Act (as in effect on such date) for which both predicate offenses are, without regard to their date of commission, otherwise covered by section 241(a)(2)(A)(I) of such Act (as so in effect).

deportation at all once he has been deported.

All the above history merely sets the legal stage for the substantive arguments that were made by petitioner in support of his petition for a stay of deportation. One of the changes made by the AEDPA was a restriction on who could avail him or herself of the discretionary relief provisions of the now repealed Section 212(c) of the INA, 8 U.S.C. § 1182(c). Section 212(c) used to provide for discretionary relief from deportation based on factors such as particularly close ties to the United States, positive employment history, good character, etc. Section 440(d) of the AEDPA made Section 212(c) relief unavailable to those deported by reason of having committed one of several enumerated criminal offenses (including the one of which Fuller was convicted), and the IIRIRA repealed Section 212(c) entirely.

In *Henderson v. INS,* the Second Circuit came to the conclusion that the section of the AEDPA restricting the availability of 212(c) relief does not apply retroactively to those immigration cases that had already begun on the date of the statute's enactment (April 24, 1996). 157 F.3d at 128. However, the court specifically declined to reach the question of whether the provisions of the AEDPA reached aliens whose primary conduct (i.e., the original criminal convictions) occurred prior to April 24, 1996. *Id.,* n. 28. Mr. Fuller falls into this category, as his conviction occurred on May 13, 1992 (before the effective date of the AEDPA), but the Order to Show Cause from the INS did not issue until December 24, 1996 (after passage of the AEDPA), thus setting up the question left open in *Henderson.*

Since *Henderson,* a number of district courts in this circuit have issued decisions consistent with Mr. Fuller's position that the AEDPA cannot be applied retroactively to preclude discretionary relief under Section 212(c) when either the criminal conviction or the underlying criminal acts took place before the effective date of the statutes. *Pottinger v. Reno,* 51 F.Supp.2d 349 (E.D.N.Y.1999) (elimination of discretionary relief did not apply retroactively to conduct predating statute's enactment); *Dunbar v. INS,* 64 F.Supp.2d 47 (D.Conn. 1999) (same); *Pena–Rosario v. Reno,* 83 F.Supp.2d 349 (E.D.N.Y.2000) (same). All these courts reasoned that the failure of Congress to explicitly indicate that the amendments should reach conduct predating their enactment, and the consequences that the new statute attached to events completed before its enactment, required a finding of no retroactive application. The courts also looked to notions of fundamental fairness implicated in the retroactivity analysis:

> In the instant case, involving a radical change in the law eliminating a major opportunity to avoid deportation from the country of the petitioner's family and upbringing to one with which he has virtually no connection, "sound instincts" cry out against retroactivity. What is involved here is a fundamental aspect of life and liberty of the petitioner.

*Pottinger,* 51 F.Supp.2d at 351. This non-retroactivity issue, raised by Mr. Fuller in his petition, therefore remains open in this circuit, and petitioner's argument that the INS erred by applying the amendments retroactively to deny him access to 212(c) relief has found substantial support in the federal courts. *See e,g,, Tasios v. Reno,* 204 F.3d 544 (4th Cir.2000) (section of AEDPA precluding discretionary relief did not apply retroactively to guilty pleas or concessions of deportability predating its enactment); *Wallace v. Reno,* 24 F.Supp.2d 104 (D.Mass.1998) (AEDPA's restrictions on availability of discretionary

relief did not apply to alien who pled guilty before effective date of amendment).

Thus, Mr. Fuller's petition raised significant legal issues that are subject to serious debate. Had the petition and stay of deportation been brought to the Court's attention in a timely fashion, the Court would have entered a temporary stay to allow briefing on these issues.

## B. INS MOTION TO DISMISS

The Court, however, cannot reach the merits of petitioner's substantive claims without first resolving two claimed jurisdictional defects raised in the respondent's motion to dismiss. The INS contends that 1) where the petitioner has failed to exhaust his statutorily required administrative remedies, or 2) where the petitioner has been deported, the Court has no jurisdiction to hear the case.

### 1. *Exhaustion of Administrative Remedies*

The INS maintains that the petitioner failed to exhaust his administrative remedies by not appealing the Immigration Law Judge's decision to the BIA. The petitioner does not dispute that he failed to appeal the decision. Fuller contends that he fully exhausted his administrative remedies by moving to reopen his case, and that exhaustion would have been futile because the United States Attorney General has directed the BIA to apply the AEDPA retroactively to such cases as his.

■ It is well-settled that petitioners must exhaust their administrative remedies before bringing habeas corpus petitions pursuant to 28 U.S.C. § 2241. *See Gonzalez v. Perrill,* 919 F.2d 1, 2 (2d Cir. 1990) ("The controlling standard is unambiguous: an appellant must exhaust his administrative remedies before seeking federal review..."); *Lleo–Fernandez v. INS,* 989 F.Supp. 518, 519 (S.D.N.Y.1998)

("aliens challenging detention by INS must first exhaust administrative remedies before obtaining habeas review"); *Salazar v. Reich,* 940 F.Supp. 96, 98 (S.D.N.Y.1996) ("it long has been established that an applicant for the writ first must exhaust his administrative remedies"); *Oliva v. INS,* No. 98Civ6526, 1999 WL 61818, at *4 (S.D.N.Y. Feb. 10, 1999) (citing cases).

Respondent correctly asserts that exhaustion is required in habeas cases, yet it relies on the statutory exhaustion requirement contained in the old Section 1105a(c), which provides that a court may not review a final order of deportation if "the alien has not exhausted the administrative remedies available to him as of right." 8 U.S.C. § 1105a(c) (1994). As noted above, the applicable statutes and transitional provisions attempt to preclude any form of judicial review, and the INS unsuccessfully made such an argument in *Henderson. See* 157 F.3d at 122. It would appear to be inconsistent to find that a statute that seeks to deprive aliens convicted of certain offenses of all forms of judicial review at the same time requires those aliens to exhaust their administrative remedies before seeking that non-existent review.

In the Court's view, the applicable precedent is not that developed under Section 1105a(c), but the extensive precedent cited above requiring exhaustion before proceeding on a petition for a writ of habeas corpus. The appropriate standard for determination of whether petitioner was excused from the exhaustion requirement is that of *Gonzalez v. Perrill,* in which the Second Circuit noted in the context of a § 2241 petition that the "controlling standard is unambiguous: an appellant must exhaust his administrative remedies before seeking federal review ... *unless administrative procedures are unavailable or are incompetent to provide adequate redress.*" 919 F.2d at 2 (emphasis added).

Mr. Fuller argues that application of this exception in his case is warranted, because at the time of his hearing before the IJ, the Attorney General had definitively concluded that the AEDPA amendments to Section 212(c) relief applied retroactively. *See In re Soriano*, 1996 WL 426888, Interim Decision BIA 3289 (June 27, 1996). In that case, the Board of Immigration Appeals had found to the contrary, but had referred its decision to the Attorney General pursuant to the request of the Commissioner of the Immigration and Naturalization Service under 8 C.F.R. § 3.1(h)(iii). *Id.* at *37. The Attorney General disagreed, concluding that the amendments applied to proceedings that had already been initiated as of the statute's effective date, and as a consequence the BIA summarily reversed its position on the issue. *See Henderson*, 157 F.3d at 110.

██ Therefore, the results of Mr. Fuller's appeal to the BIA, had he made one, were predetermined; the Attorney General's position precluded the BIA from granting Mr. Fuller the relief he sought. Thus, where the BIA institutionally interprets the contested statutory provision against the petitioner, that forum is incompetent to provide the relief sought. *See ·Maria v. McElroy*, 68 F.Supp.2d 206, 216 (E.D.N.Y.1999) ("... the futility of one in [pro se petitioner's] position making a claim for section 212(c) relief at a time when the Attorney General had already concluded that section 440(d) applied retroactively without respect to the date of the crime, the conviction, or the com-

mencement of the administrative proceedings warrants an exception to the exhaustion requirement"). As the administrative process would have been unable to provide adequate redress, the failure of Mr. Fuller to fully use that process is thus excused.[3]

*2. Statutory Bar to Jurisdiction in § 1105a(c)*

The INS raises a more serious challenge to this Court's jurisdiction by arguing that Mr. Fuller's deportation after the filing of the petition and stay petition divests the Court of jurisdiction to hear his petition. The INS premises this argument on another clause in 8 U.S.C. Section 1105a(c) of the INA, which provides that "an order of deportation shall not be reviewed by any court if the alien... has departed from the United States after the issuance of the [deportation] order." Although Section 1105a was repealed by the IIRIRA, the INS contends that it is incorporated in the transitional rules applicable to Mr. Fuller, because of the language in the transitional rules that deportation proceedings commenced prior to October 30, 1996 "shall continue to be conducted without regard to such amendments," subject to the changes enumerated in Section 309(c)(4) discussed *supra*.

The Court plainly had jurisdiction at the time Mr. Fuller filed his petition for a stay, and just as plainly, the Court would have granted at least a temporary stay, due to the potential merit of his claim. Had everything gone according to procedure in

---

**3.** As noted above, the proceedings against Mr. Fuller were initiated on December 17, 1996, subsequent to the effective date of both the AEDPA and the IIRIRA, while his criminal acts and convictions pre-date the passage of these statutes. Mr. Fuller's situation is thus not identical to that of the petitioner in *Soriano*, but in order for the BIA to find in his favor, it would not only have had to countermand the Attorney General's directive in *Sori-*

*ano*, but also would have had to extend 212(c) relief to an even broader class of aliens. *See Henderson*, 157 F.3d at 128, n. 28 (noting that question of retroactive application to criminal convictions occurring prior to April 24, 1996 was broader than question of whether amendments applied to cases pending on that date). It is thus implausible that the BIA would nonetheless have reached this result, and granted petitioner his requested relief.

this case, the Court would have retained jurisdiction to address the legal issues, as the clerk's office would have promptly and properly docketed the petition and stay of deportation and notified the Court that urgent attention may be required, the U.S. Attorney's office would have contacted the INS and then informed the Court that Mr. Fuller's deportation was imminent, and the INS would have been informed that Mr. Fuller did indeed have a stay petition pending.

Yet all of these safeguards, such as they were, failed in the instant case. The substantial docket delay, misdocketing and inattentiveness on the part of the clerk's office reflects serious procedural deficiencies in addressing the potential urgency of immigration cases. It appears from the docket sheet that the clerk's office took five calendar days (four business days) to even docket the petition, proceeded to then misdocket it, and as of six days after filing, had still not brought it to the Court's attention.[4]

The INS, the U.S. Attorney's office, and petitioner's counsel also share in the blame for this series of events. Although there is no evidence to suggest that the Government acted purposefully to subvert the Court's jurisdiction, the gravity of the consequences to Mr. Fuller at the time were apparent. As the Second Circuit has noted, "[d]eportation is a sanction which in severity surpasses all but the most Draconian criminal penalties." *Lok v. INS*, 548 F.2d 37, 39 (2d Cir.1977). Yet the INS was at best perfunctory in its efforts to ascertain whether a petition for stay was pending, importantly failing to contact the U.S. Attorney's office before deporting Mr. Fuller, even in the face of his insistence that some sort of challenge to his deporta-

tion had been filed. The U.S. Attorney's office, for its part, had been served with the petition on March 16, 1999, two days before petitioner's deportation, yet had made no attempts to contact the INS or this Court to clarify Mr. Fuller's status. Whether this failing can be characterized as excusable neglect under the shortened timetable at issue, or dilatory conduct approaching heedlessness given the severity of the consequences to Mr. Fuller, need not be decided at this juncture, as the Government has conceded that such findings "are not necessary" to the Court's decision whether or not to retain jurisdiction. Transcript of April 26, 2000 Status Conference at 6.

■ The Court concludes that in these highly unusual circumstances, where the Court properly had jurisdiction at the inception of the case and would have granted Mr. Fuller's stay but for delinquencies on the part of the clerk's office and the failure of both petitioner's counsel and the U.S. Attorney's office to alert the Court, it is not divested of jurisdiction by Mr. Fuller's removal from the country. *See Michael v. INS*, 48 F.3d 657, 664 (2d Cir.1995) (federal court has residual power under All Writs Act to preserve its potential jurisdiction, and such relief may be appropriately exercised in extraordinary case, because "[i]t may sometimes happen that an alien will be unsuccessful in gaining a stay of deportation from either the BIA or the district director and will be deported before the BIA has ruled finally on the motion to reopen...").

The Government argues against retaining jurisdiction in the face of Section 1105a(c), pointing to pre-AEDPA case law characterizing the provision as "a clear

---

**4.** This Court has requested that the Clerk of Court ensure that all clerk's office staff are aware of the potential time sensitivity of im-

migration petitions such that they are hereafter brought to the immediate attention of the assigned judge.

jurisdictional bar." *Roldan v. Racette*, 984 F.2d 85 (2d Cir.1993). *Roldan* and all the other cases cited by the Government were decided within the context of the old immigration laws, at which time mere service of a petition for review on the Court of Appeals triggered an automatic stay of deportation. 8 U.S.C. § 1105a(c)(3) (1994). Further, *Roldan's* description of the provision as "admit[ting] of no exceptions," 984 F.2d at 90, referred to the gloss that the Ninth Circuit had placed on that section in *Mendez v. INS*, 563 F.2d 956 (9th Cir. 1977), by applying § 1105a(c) to only those deportations executed in accordance with procedural due process. In rejecting the Ninth Circuit's interpretation, the Second Circuit held that allegations of defects in the deportation proceeding itself would be insufficient to avoid the effect of § 1105a(c). *Id.* Such allegations, however, are not at issue in the instant case, as petitioner does not seek an exception to the statutory provision based on procedural inadequacies in the hearing. Rather, Mr. Fuller raised a legitimate legal issue through the proper channels that would have justified a stay of deportation, and was thwarted only by system failures that were beyond his personal control.

In fact, since *Roldan* the Second Circuit has suggested that, in certain situations, exceptions to the ban that do not raise procedural challenges to the hearing may indeed apply. *See Mejia–Ruiz v. INS*, 51 F.3d 358, 365 (2d Cir.1995) (castigating Government for deporting petitioner without notice to the court or counsel, when INS knew that staff attorneys and petitioner's counsel were seeking to place stay before the court, but dismissing petition for lack of jurisdiction because petitioner had departed voluntarily during pendency of appeal of deportation order to the BIA); *Edwards v. INS*, 59 F.3d 5, 7 n. 2 (2d Cir.1995) (dismissing petition for lack of subject matter jurisdiction where alien had miscaptioned petition such that it did not reach the Court of Appeals in sufficient time to trigger automatic stay, but suggesting that different result might obtain if dilatory conduct of the clerk's office were implicated).

Further, an examination of the legislative history of the limitations on judicial review contained in Section 1105a(c) reveals that they were not intended for situations such as Mr. Fuller's. Rather, the legislative history reflects Congressional intent to eliminate repetitious and unjustified appeals to courts for the purpose of interfering with the enforcement of deportation orders. H.R.Rep. No. 1086, 87th Cong., 1st Sess. (1961), reprinted in 1961 U.S.C.C.A.N. 2950. The House Report cites to the "unnecessary and unjustified legal maneuvers" that deportable aliens have utilized to unduly delay their deportation. *Id.* "Without any reflection upon the courts, it is undoubtedly now the fact that such tactics can prevent enforcement of the deportation provisions of the Immigration and Nationality Act by repetitive appeals to the busy and overworked courts with frivolous claims of impropriety in the deportation proceedings." *Id.* The limitations on judicial review contained in the original Section 1105a(c) were enacted to preserve an alien's right to challenge the government's finding of deportability through the judicial process, while limiting access to the courts for aliens whose sole purpose in seeking review is delay of his or her justifiable expulsion. *Id.*

Mr. Fuller does not appear to fall within the category of chronic appellants seeking to delay the inevitable, as contemplated by the legislative history. He has not sought repeated review, nor does he claim impropriety in the deportation procedure itself; rather, he challenges the substance of the IJ's legal determination that he was not entitled to apply for a § 212(c) waiver, due

to intervening changes in the law. Petitioner therefore differs from the deported alien who is precluded from challenging his deportation after the fact by § 1105a(c). *See Roldan,* 984 F.2d at 86 (protesting procedures employed in deportation hearing, and alleged failure of INS to inform him of certain rights at initial hearing); *Baez v. INS,* 41 F.3d 19, 22 (1st Cir.1994) (alleging errors in process leading to deportation, such as late service of INS brief and failure to notify petitioner's counsel). In contrast, petitioner here does not ask the Court to interfere with the procedures employed in his deportation; rather, he asks the Court to remand his case and order the IJ to undertake the § 212(c) review that he contends was unlawfully denied him in the first instance.

Finally, the facts of the mishaps in this case are compelling, but the identical juxtaposition of institutional failures against a legal backdrop seemingly providing no remedy will rarely, if ever, recur. As noted in the discussion *supra* regarding the changes in the immigration laws, the transitional rules have a limited temporal duration, after which Section 1105a(c) will no longer apply. In addition, the incertitude in the law at the time of Mr. Fuller's deportation is beginning to coalesce, as immigration cases under the new law's transitional and permanent rules reach the Courts of Appeals. *See Liang v. INS,* 206 F.3d 308 (3rd Cir.2000) (interpreting permanent provisions of IIRIRA, and noting growing consensus among courts of appeals and district courts regarding scope and availability of habeas relief). Also, the chance that multiple system failures such as transpired in this case will occur again is extremely remote, given the expeditious attention to these cases that will now be paid by the clerk's office, the Government, and presumably petitioner's counsel. This case is, most likely, a singular occurrence, and the "last resort" of the All Writs Act,

which is designed to preserve jurisdiction that the court has acquired from some other independent source in law, *see United States v. Tablie,* 166 F.3d 505, 507 (2d Cir.1999) (internal citations omitted), is therefore appropriately invoked to prevent further injustice.

All of these factors persuade the Court that it has not lost jurisdiction over Mr. Fuller's petition, despite the circumstances of his removal from the country, where a meritorious petition to stay had been timely filed and served on the U.S. Attorney's office, although not served on the INS, but due to lapses and institutional failures on the part of many, was not timely brought to the Court's attention. The Court is not satisfied with a resolution that simply adopts the Government's characterization of Mr. Fuller's deportation as a *fait accompli.* Accordingly, the motion to dismiss on those grounds is denied.

### 3. Habeas "In Custody" Requirement

Mr. Fuller's travails are not yet over, however, because in order for this Court to grant him the habeas relief he seeks, he must be "in custody" within the meaning of Section 2241. That statute states that:

(c) The writ of habeas corpus shall not extend to a prisoner unless—

(1) He is *in custody* under or by color of the authority of the United States or is committed for trial before some court thereof; or

(2) He is *in custody* for an act done or omitted in pursuance of an Act of Congress, or an order, process, judgment or decree of a court or judge of the United States; or

(3) He is *in custody* in violation of the Constitution or laws or treaties of the United States; or

(4) He, being a citizen of a foreign state and domiciled therein is *in custody*

for an act done or omitted under any alleged right, title, authority, privilege, protection, or exemption claimed under the commission, order or sanction of any foreign state, or under color thereof, the validity and effect of which depend upon the law of nations; or

(5) It is necessary to bring him into court to testify or for trial.

28 U.S.C. § 2241 (emphasis added).

In cases brought under § 2241, some courts have interpreted deportation as divesting the court of jurisdiction. *See, e.g., Sinclair v. INS,* No. 98Civ537, 1998 WL 856113, *2 (S.D.N.Y. Dec. 9, 1998) ("In immigration cases, courts have required that the petitioner actually be in custody to be eligible for habeas relief."); *Maung v. McElroy,* No. 98Civ5380, 1998 WL 896709, *2 (S.D.N.Y. Dec. 10, 1998). These courts employ a rather truncated analysis, however, and rely mainly on cases dismissing petitions for lack of subject matter jurisdiction under § 1105a(c), *supra.* As the Court has already determined that in the unique circumstances of this case, § 1105a(c) does not bar consideration of Mr. Fuller's claims, a more extensive analysis of the "in custody" requirement is necessary, beginning with the decision in *Henderson.*

As referenced *supra,* in *Henderson* the Second Circuit recognized that federal courts still have habeas jurisdiction pursuant to 28 U.S.C. § 2241 to address constitutional or statutory challenges to deportation proceedings. *Henderson,* 157 F.3d at 122. The *Henderson* court reached this conclusion after a lengthy canvas of the writ as it has been used historically to guarantee judicial review of executive deportation decisions, *id.* at 112–116, starting with *United States v. Jung Ah Lung,* 124 U.S. 621, 8 S.Ct. 663, 31 L.Ed. 591 (1888). In that case Chinese laborer who had lost his certificate entitling him to reenter the United States and was being held in executive detention upon his return, successfully turned to the district court for a writ of habeas corpus. The government argued that under the Chinese Exclusion Acts, passed in the late nineteenth century, aliens excluded under the statute were not being deprived of liberty within the contemplation of the habeas statute. The Supreme Court responded:

It is urged that the only restraint of the party was that he was not permitted to enter the United States. But we are of opinion that the case was a proper one for the issuing of the writ. The party was in custody. The return of the master was that he held him in custody by direction of the customs authorities of the port, under the provisions of the Chinese Restriction Act. That was an act of Congress. He was therefore in custody under or by color of the authority of the United States, within the meaning of [the Habeas Corpus Act].

*Id.* at 626, 8 S.Ct. 663.

Since 1888, then, aliens refused entry into the United States have been able to test the validity of that exclusion by habeas, even though that person is technically free to go anywhere in the world, save this country. *See Nishimura v. United States,* 142 U.S. 651, 12 S.Ct. 336, 35 L.Ed. 1146 (1892) ("An alien immigrant, prevented from landing by any such officer claiming authority to do so under an act of Congress, and thereby restrained of his liberty, is doubtless entitled to a writ of habeas corpus to ascertain whether the restraint is lawful."); *Shaughnessy v. U.S. ex rel. Mezei,* 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953); *see also* James S. Liebman & Randy Hertz, Federal Habeas Corpus Practice and Procedure, § 8.2(b) (1994) (outlining early cases allowing habeas corpus jurisdiction to continue even after the petitioner's departure).

The writ has also been applied to situations where at some point after the application for the writ, custody was transferred to someone other than the respondent. *Ex Parte Mitsuye Endo,* 323 U.S. 283, 65 S.Ct. 208, 89 L.Ed. 243 (once habeas jurisdiction attaches, it was not ousted by subsequent transfer of petitioner ); *Ex parte Catanzaro,* 138 F.2d 100 (3rd Cir.1943) (In case involving failure to report under Selective Service Act, "we do not believe that passing about of the body of a prisoner from one custodian to another after a writ of habeas corpus has been applied for can defeat the jurisdiction of the Court to grant or refuse the writ on the merits of the application. It is a general rule of law that where one has become subject to the jurisdiction of a court, the jurisdiction continues in all proceedings arising out of the litigation such as appeals and writs of error."). This history demonstrates that the meaning of "custody" is not limited to actual physical restraint by the respondent.

This understanding of the "custody" requirement in habeas corpus review gains further support in the case law analyzing "custody" for purposes of post-conviction habeas relief. The traditional strict custody requirement has been greatly expanded over the last several decades, as "stifling formalisms" and "arcane and scholastic procedural requirements" have given way. *Hensley v. Municipal Court,* 411 U.S. 345, 350, 93 S.Ct. 1571, 36 L.Ed.2d 294 (1973) (holding that person released on his own recognizance pending execution of sentence is "in custody" within the meaning of 28 U.S.C. § 2241). "History, usage and precedent can leave no doubt that, besides physical imprisonment, there are other restraints on a man's liberty, restraints not shared by the public generally, which have been thought sufficient in the English-speaking world . . . to support the issuance

of habeas corpus." *Jones v. Cunningham,* 371 U.S. 236, 240–42, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963) (paroled person is within "custody" of parole board for habeas purposes, because the control of that board "involves significant restraints on petitioner's liberty."). And in *Carafas v. LaVallee,* 391 U.S. 234, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968), the Court allowed the writ in a challenge to a state-court judgment even though the prisoner, incarcerated at the time the writ was filed, had finished serving his sentence during the proceedings.

The Supreme Court has expressed some second thoughts about this expansive interpretation, as indicated in *Lehman v. Lycoming County Children's Services Agency,* 458 U.S. 502, 102 S.Ct. 3231, 73 L.Ed.2d 928 (1982), where it tightened the "in custody" requirement for those seeking relief from state court judgments under 28 U.S.C. § 2254. The petitioner in *Lehman* sought to overturn a state court termination of parental rights, and argued that the children, who were in foster care, were "in custody" of the state sufficient for a habeas writ to issue. The Supreme Court concluded that the scope of habeas could not extend that far, but based its limitations on the principles of comity and federalism, considerations not involved in habeas cases challenging federal action under the immigration statutes. 458 U.S. at 508, n. 9, 102 S.Ct. 3231 ("Where habeas corpus is made available by a federal court to challenge custody by federal entities, federalism concerns are not implicated.").

A further line of jurisprudence determines jurisdiction based on the custody of the petitioner at the time he or she first sought the writ. The Supreme Court and the Second Circuit have held that as long as the petitioner was in custody at the time the writ was filed, a later release will not moot the habeas petition and the court

still has jurisdiction. *See e.g. Graham v. Smith,* 602 F.2d 1078 (2d Cir.1979) (where prisoner released one year before district court upheld his petition, case not moot). As explained in *Carafas,* once federal jurisdiction has attached in federal district court by the filing of the application for the writ, it will not be defeated by the petitioner's release as long as the petitioner will still suffer "collateral consequences" of his conviction, such as not being able to serve as a juror, vote, or hold a position in a labor union. 391 U.S. at 237, 88 S.Ct. 1556. The *Carafas* court noted that the statute itself does not limit the relief that may be granted to discharge of the applicant from physical custody. "Its mandate is broad with respect to the relief that may be granted." *Id.* at 239, 88 S.Ct. 1556. Therefore, as long as the applicant is "in custody" when the petition for habeas corpus is filed, the federal statute is satisfied. *Id.; see also Spencer v. Kemna,* 523 U.S. 1, 118 S.Ct. 978, 983, 140 L.Ed.2d 43 (1998) ("[Petitioner] was incarcerated by reason of the parole revocation at the time the petition was filed, which is all the "in custody" provision of 28 U.S.C. § 2254 requires.").

The above principles have been applied to the immigration context. *See Galaviz–Medina v. Wooten,* 27 F.3d 487, 493 (10th Cir.1994) ("This change in philosophy has likewise applied to habeas actions arising from immigration cases."). For instance, in *Ledesma–Valdes v. Sava,* 604 F.Supp. 675, 678 (S.D.N.Y.1985), the district court retained habeas jurisdiction over the petition, even though petitioners were on board a plane to Texas at the time the order to show cause was signed. The court rejected a challenge to its jurisdiction based on this fact, holding:

> The issue ... is not where respondent placed the petitioners while they were in his custody, but whether the Court had jurisdiction over respondent as petitioners' custodian at the time the petition was filed and the order to show cause served.

*Id.* at 678. Because at the point the petition was filed, the INS district director did have custody of the petitioners, even though they boarded a plane to Texas fifteen minutes later, the court determined it had habeas jurisdiction, and proceeded to pass upon the merits. The Fifth Circuit in *Umanzor v. Lambert,* 782 F.2d 1299, 1301 (5th Cir.1986) cited to *Ledesma–Valdes* when it determined that an alien's petition for habeas corpus filed while the alien was on board the aircraft that returned him to El Salvador was not mooted by his deportation. 782 F.2d at 1301. The Court stated it had "little difficulty concluding that Umanzor was under actual physical restraint by the government's agent—the airline—at the moment the habeas petition was filed." *Id.*

■ This Court bases its conclusion that it retains habeas jurisdiction over Mr. Fuller's claims on this line of reasoning, even though he was involuntarily deported to Jamaica six days after the petition was filed. Jurisdiction had clearly attached at the time the petition was filed, would have continued if the sought-after stay had been able to be timely ordered, and certain collateral consequences most definitely will flow from his deportation. In the words of the Supreme Court, deportation is "at times equivalent of banishment or exile ...." *Costello v. INS,* 376 U.S. 120, 131, 84 S.Ct. 580, 11 L.Ed.2d 559 (1964). Not only has Mr. Fuller been removed to a country where he is a virtual stranger, but he faces significant repercussions as a result of his deportation. For instance, 8 U.S.C. § 1326 provides that any deported alien who later enters, attempts to enter, or is found in the United States shall be guilty of a felony, one punishable by a fine or imprisonment, or both. Should he be

subject to such a penalty, Mr. Fuller would be unable to collaterally attack the validity of the original order of deportation as defense to prosecution. *See United States v. Petrella*, 707 F.2d 64 (2d Cir.1983). In addition, 8 U.S.C. § 1182(a)(9) provides that aliens who have been arrested and deported and who seek readmission within five years are ineligible for visas and shall be excluded from admission into the United States. Such restraints are not shared "by the public generally," *Jones*, 371 U.S. at 240, 83 S.Ct. 373, and the Court believes they are sufficient to support retention of jurisdiction.

The broader understanding of the "in custody" requirement outlined in the above analysis persuades the Court that despite Mr. Fuller's deportation, it retains jurisdiction over his petition. Defendant's motion to dismiss the petition for lack of subject matter jurisdiction is therefore denied.

### 4. Merits of Mr. Fuller's Habeas Petition

As indicated above, three district courts have concluded that the elimination of Section 212(c) relief in the AEDPA would not be applied retroactively to pre-AEDPA criminal conduct, *Dunbar*, 64 F.Supp.2d 47, 52, *Pena–Rosario*, 83 F.Supp.2d at 366, or pre-AEDPA criminal convictions, *Maria*, 68 F.Supp.2d at 227. A district court in Massachusetts has also held that AEDPA's restrictions on discretionary relief did not apply to an alien who had plead guilty prior to the enactment of the amendments to the immigration laws. *Wallace v. Reno*, 24 F.Supp.2d 104 (D.Mass.1998), *aff'd on different grounds*, 194 F.3d 279 (1st Cir. 1999).

While the parties here have not comprehensively addressed the issue, focusing instead on the Government's challenge to the Court's subject matter jurisdiction, the Government does contend that remanding this matter would be fruitless because the petitioner is not entitled to the relief he requests under the AEDPA. According to the Government, Mr. Fuller failed to "apply" for § 212(c) relief until his motion to re-open the IJ's decision, and as that motion is akin to initiating a new proceeding under the First Circuit case of *Wright v. Ouellette*, 171 F.3d 8 (1st Cir.1999), no retroactivity problems are presented, as his "application" for § 212(c) relief would then have post-dated the enactment of AEDPA. The Court is not persuaded by this argument, for a variety of reasons.

First, the decision of the Immigration Law Judge states that "[e]xcept as indicated below, the respondent did not request, and does not appear eligible for, relief from deportation." Def. Ex. B. The following fill-in-the-blank portion, however, has three different provisions checked, the first of which is "[t]he respondent is not eligible for relief under section 212(c) of the Act as amended by section 440(d) of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) ... because the respondent is deportable by reason of having committed a criminal offense covered by section 212(a)(2)(A)(iii), (B), (C), or (D)...." Although not explicit, this form indicates that Mr. Fuller did request some form of discretionary relief at the July 23, 1997 hearing, or that the IJ believed he had done so. That Mr. Fuller would make such a request at a hearing before the IJ is consistent with both applicable regulations, *see* 8 C.F.R. § 212.3(e)(1) ("An application for the exercise of discretion under section Section 212(c) may be ... submitted in proceedings before an Immigration Judge.") and understood practice before immigration law judges. *See Mathews v. Reno*, 52 F.Supp.2d 195, 202–03 (D.Mass. 1999) ("Although INS regulations appear to allow an alien to file an application for

section 212(c) relief 'at any time,' the far more ordinary course is for the recipient of an Order to Show Cause to wait until the deportation hearing before an IJ to notice his intent to apply for, and/or lodge, an actual application.") (internal citations omitted). Further, Mr. Fuller had no control over when the proceedings against him were commenced or the scheduling of the hearing before the IJ. As it appears from the record before the Court that Mr. Fuller did request discretionary relief at the first available option, the Court attaches little significance to the date of his application.

Second, the decision in *Wright v. Ouellette* is distinguishable. 171 F.3d at 8. There, the alien's request for discretionary relief had first been denied by the IJ in 1993, and was affirmed by the BIA three years later, prior to the enactment of AEDPA. A day after the statute became effective, the alien moved to reopen, and his petition was denied due to the changes in the law. On appeal, the First Circuit concluded that the motion to re-open was subject to AEDPA's cut-off of § 212(c) relief, because a motion to re-open is "more akin to starting a new proceeding" and thus the case did not involve a question of retroactivity. *Wright* does not change the Court's analysis, because as outlined above, it appears that Mr. Fuller had requested discretionary relief at the first available opportunity, which was denied by the IJ's retroactive application of Section 440(d) and the Attorney General's opinion in *In re Soriano. See* Def. Ex. B (Opinion of the IJ). On the record before the Court, it appears that Mr. Fuller was denied § 212(c) relief at the IJ hearing.

*Wright v. Ouellette* thus does not dispose of Mr. Fuller's claim regarding the wrongful retroactive application of § 440(d). Further, the Court is persuaded by the cogent analyses of the retroactivity question in *Dunbar, Maria,* and *Pena–Rosario,* and reaches the same conclusion.

Starting with the text of the relevant statute, as the Supreme Court counsels in *Landgraf v. USI Film Prods.,* 511 U.S. 244, 280, 114 S.Ct. 1483 (1994), Congress' intent on the question of retroactive application is, at the very least, equivocal. *Compare* AEDPA § 440(f) (making changes to definition of aggravated felony "apply to convictions entered on or after the date of the enactment of this Act") *and* IIRIRA § 321(c) (amending the definition of aggravated felon and stating "the term applies regardless of whether the conviction was entered before, on, or after the date of enactment of this paragraph"), *with* IIRIRA § 304(b) *and* AEDPA § 440(d) (provisions ending discretionary waiver for aggravated felons, containing no language indicating retroactive application). By negative implication, the *Maria* court concluded that Congressional silence in Section 304(b) and Section 440(d) allowed an inference that Congress did not wish these provisions to apply retroactively, while the court in *Pena–Rosario,* 83 F.Supp.2d at 365, held that the differences in statutory language quoted above rendered Congressional intent unclear.

This Court also agrees that the statute would have the retroactive effect disfavored under *Landgraf,* because "the new provision attaches new legal consequences to events completed before its enactment." 511 U.S. at 269, 114 S.Ct. 1483. The amendments to the immigration laws in AEDPA and IIRIRA convert the possibility of deportation for the commission of certain crimes into a certainty. "The replacement of a discretionary regime with a mandatory one is of momentous formal and practical significance." *Pena–Rosario,* 83 F.Supp.2d at 365. Indeed, between the years 1989 and 1994, over half of the total number of applications for relief un-

der Section 212(c) were granted. *See* U.S. Department of Justice Executive Office for Immigration Review Statistical Sheet 1, Jan. 19, 1995, *cited in Mojica v. Reno,* 970 F.Supp. 130, 178 (S.D.N.Y.1997), *aff'd in part, Henderson,* 157 F.3d at 130. The Court agrees with *Maria* that this change from a potential consequence—possible deportation if § 212(c) relief is not granted—to a certain consequence is analogous to eliminating a defense from a suit, or changing a maximum sentence to a mandatory one, and thus under controlling Supreme Court ex post facto jurisprudence, such an effect cannot be imposed absent a clear statement from Congress. *Maria,* 68 F.Supp.2d at 230, *citing Lindsey v. Washington,* 301 U.S. 397, 57 S.Ct. 797, 81 L.Ed. 1182 (1937), *Hughes Aircraft v. U.S. ex rel. Schumer,* 520 U.S. 939, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997). As there is no such clear statement in AEDPA and IIRIRA, Mr. Fuller's request for Section 212(c) relief should have been governed by the law that was in effect at the time of the guilty conviction which prompted his deportation.

### 5. Remand

The IJ in this case erred in applying AEDPA and IIRIRA amendments retroactively to bar Mr. Fuller's claim for Section 212(c) relief, and petitioner's case should therefore be remanded to allow such a claim to proceed. While the Court may have authority under the All Writs Act to order him returned for this purpose, 28 U.S.C. § 1651(a), as the parties did not brief the issue the Court declines to reach it at this juncture. The Court will retain jurisdiction over Mr. Fuller's petition and will reach this issue upon further briefing.

## IV. CONCLUSION

The Court's decision in this difficult case is primarily prophylactic in nature, intended to preserve jurisdiction in the face of a chain of inexcusable mistakes (on the part of the clerk's office) and preventable mishaps (on the part of the Government and petitioner's counsel). While Mr. Fuller is undoubtedly charged with his own counsel's dereliction in informing the Court of the motion to stay, in this case a number of offices of the Government and the judiciary failed to provide the minimal institutional checks on the plenary power that immigration authorities exercise. Given the magnitude of the consequences to aliens in Mr. Fuller's circumstances, holding the Government to a higher standard of diligence than the potential deportee's counsel works no unfairness. Further, were the Court to grant the Government's motion to dismiss in this case, in the future such precedent could have the effect of shielding from review more dubious behavior on the part of the Government, as long as the timing of a deportation, by happenstance or intent, pre-dated entry of an inevitable stay order.

For the reasons outlined above, Mr. Fuller's failure to exhaust the administrative procedures is excused on grounds of futility of pursuing a pre-determined position, and § 1105a(c) does not divest the Court of jurisdiction under these narrow circumstances. The Court has habeas corpus jurisdiction over Mr. Fuller's petition, as he was in custody at the time he filed and he will suffer collateral consequences from his deportation. Further, the IJ erred in holding Mr. Fuller ineligible for discretionary relief under § 212(c). The Government's Motion to Dismiss (Doc. # 6) is DENIED, and Mr. Fuller's petition (Doc. # 1) for a writ of habeas corpus is GRANTED to the extent he seeks a remand to the IJ.

As the transitional rule cases *Domond v. INS,* 99–2619, and *Pottinger v. Reno,* 99–2684 were recently argued to the Second

Circuit and rulings by that court are expected shortly, the stay entered by this Court on May 2, 2000 remains in effect. Once rulings in these cases are issued, the Court will order a further briefing schedule on the issues remaining.

IT IS SO ORDERED.